**BUSH & BURCHETT, INC., Petitioner,**

v.

**Robert B. REICH, Secretary of Labor;
The Occupational Safety & Health
Review Commission, Respondents.**

No. 95–4331.

United States Court of Appeals,
Sixth Circuit.

Argued Nov. 22, 1996

Decided Jan. 22, 1997.*

---

* This decision was originally issued as an "unpublished decision" filed on January 22, 1997.

Ray Darling, Secretary, OSHRC, Washington, DC, for Respondent Occupational Safety & Health Review Commission.

Albert A. Burchett (argued and briefed), Prestonsburg, Kentucky, for Petitioner.

Daniel J. Mick, Elizabeth Hopkins, U.S. Department of Labor, Office of the Solicitor, Washington, DC, Elizabeth Hopkins (argued and briefed), Allen H. Feldman, U.S. Department of Labor, Office of the Solicitor, Washington, DC, Deborah Pierce–Shields, Office of the Regional Solicitor, U.S. Department of Labor, Philadelphia, PA, for Respondent Robert B. Reich, Secretary of Labor.

Before: KENNEDY, BOGGS, and WOOD,** Circuit Judges.

## OPINION

BOGGS, Circuit Judge.

This case arises from the issuance of three citations by the Secretary of Labor against Bush & Burchett, Inc. ("BBI") for violations of the Occupational Safety and Health Act of 1970. The violations were issued during two separate inspections at a bridge construction site. BBI contested each citation and the two cases were consolidated. BBI argues on appeal that the Occupational Safety and Health Review Commission ("OSHRC") erred in upholding the citations because the Mine Safety and Health Act ("MSHA"), 30 U.S.C. § 801 *et seq.*, had preempted the Occupational Safety and Health Administration's ("OSHA") jurisdiction. BBI also argues on appeal that OSHRC's decision upholding $337,200 in civil penalties was not supported by the administrative law judge's ("ALJ") findings of fact and conclusions of law or supported by the evidence. We affirm.

## I

Heartland Resources, Inc. contracted with BBI to build a bridge over the Guyandotte River in West Virginia. The construction project included the roadway approaches to the bridge. Heartland was building a large coal mine on 22,000 acres of land in Lincoln County, West Virginia and needed to build the bridge to connect the surface mine at the top of Bryan Ridge Mountain to the railroad loadout facility, located on the opposite side of the Guyandotte River.[1] Even though

---

** The Honorable Harlington Wood, Jr., Circuit Judge of the United States Court of Appeals for the Seventh Circuit, sitting by designation.

1. The distance between the two locations is approximately 6.5 miles. After the coal is removed from the mountain top by surface mining, it is hauled by tractor-trailer truck down the mountain and across Route 10, the Guyandotte River, and the CSX Railroad tracks to the loadout facility, where the coal is loaded into unit trains at the rate of seven thousand tons per hour and shipped to an electric utility.

Heartland obtained seven surface disturbance permits for the extraction and loadout facilities, it did not file for a surface disturbance permit for the haul road and bridge. Instead, Heartland showed on its permit application that the transportation route from the extraction facility to the loadout facility would be a county road system although, at the time, there was no contiguous county road system in place between the surface mine and loadout facility.[2]

Heartland had made an agreement with the West Virginia Department of Transportation that Heartland would convey the bridge and haul road to the Department of Transportation after completion, to become part of the state road system. The haul road to be constructed under the agreement was to begin on Lincoln County Route 72, near Heartland's mining operation, and continue for approximately 2.4 miles to Route 72's junction with Delta Route 43. Petitioner agreed to improve Route 72 to that point. From this point, a new road was to be constructed for approximately 3.5 miles to Delta Route 38. Petitioner would improve Route 38 to its intersection with U.S. Route 10. The road would then continue over the newly constructed bridge to span Route 10, the Guyandotte River, and the mainline CSX Railroad and connect with Delta Route 25, which would be upgraded. Thus, the haul road plus the bridge would connect public roads, namely Route 72, Delta Route 43, and Delta Route 38. Under the agreement, Heartland, which owned the property,[3] was required to prepare right-of-way plans and convey all rights-of-way by proper deeds to the Department of Transportation. Heartland, under the agreement, is required to perform future maintenance on the haul road and bridge; however, the work will be subject to the Department of Transportation's approval and conditions. The West Virginia Highway Patrol polices the bridge, and the road and bridge have been given a secondary route number, indicating that it is a county road, although, at the time of trial, the haul road and bridge had not been formally conveyed to the Department of Transportation.

Because the bridge was intended for public use as part of the state road system, the Department of Transportation assigned a project supervisor to verify materials for the bridge during its construction. And, under the contract between BBI and Heartland, BBI was required to conform with the Department of Transportation's specifications and requirements.

Under the agreement between BBI and Heartland, BBI was required to establish a safety plan and program. It was Heartland's responsibility, however, to secure all necessary permits required for the construction of the bridge. Even though Heartland had obtained surface disturbance permits and begun construction of the mine, haul road, and loadout facility in 1990, it did not obtain an MSHA identification number until August 1991 and BBI never obtained an MSHA identification number.

MSHA officials believed that they did not have safety jurisdiction over the bridge site because it was not on coal company property and was not a coal company facility. Heartland also believed that MSHA did not have jurisdiction over the road and bridge construction because "[they were] built for the state." However, on September 10, 1991, MSHA had cited Heartland for failure to berm the haul road from the mine site down to the bridge, as required by MSHA regulations. Heartland abated the citation by installing berms. Later, sometime after 1992, Heartland removed the berms in response to a letter written by the Department of Transportation indicating that the raised berms had caused severe drainage and erosion problems.

---

2. The haul road being constructed could not have been permitted as a coal haul road under federal law because a cemetery is located approximately 40 feet from the haul road. 30 U.S.C. § 1272(e)(5) prohibits the operation of surface coal mining, which includes coal haul roads that fall within the definition of a mine, within one hundred feet of a cemetery.

3. Heartland or one of its sister companies owned the land where the bridge was located, as well as portions of the haul road, including the loadout facility at the railroad.

The OSHA citations involved in this case were issued as the result of two separate inspections of the bridge site. The first inspection, which began on June 20, 1991, was prompted by the deaths of two BBI employees. The second inspection, which occurred on September 4, 1991, was in response to a complaint filed by the United Steel Workers Union, Local 14–614, which represented the employees at the site.

On June 19, 1991, two fatalities occurred at the bridge site. Two BBI employees, Greg Pridemore and Ralph Snyder, died during an attempt to place one of the bridge's beams on the caps of two bridge piers. Under the plan formulated by the owner of BBI and the project manager, two cranes were to lift the concrete beam and place it on the pier caps. Pridemore and Snyder were stationed atop one of the piers. They were killed when the boom of one crane collapsed on top of the pier where they were standing.

Before the fatal lift, the cranes were positioned on solid timber mats, which had been prepared for them to travel on. They then moved up the river bank, traveling on the mats, suspending the beam a few feet above the water. When the cranes reached the pier caps, they stopped and simultaneously hoisted the beam above the pier caps. They had to stop, however, when the smaller crane came off the ground slightly. The cranes then swung their booms to move the beam closer to the pier caps, but the smaller crane continued to come off the ground. The beam was twice temporarily placed on the middle of the piers while the smaller crane was repositioned to complete the transfer. The timber mats, however, did not extend far enough. Owner Joe Burchett, foreman Jack Cochran, and supervisor Fred Smith then discussed the possibility of extending the mats. They hoped that by moving the smaller crane closer to the pier caps, they could maintain a correct boom angle that would prevent tipping. They decided, however, simply to level and compact the ground in front of the smaller crane with a backhoe and allow the crane to sit directly on the ground during the lift. The plan, however, failed and the lift resulted in overloading both cranes when the smaller crane's boom collapsed against the cap of pier two. This resulted in the end of the beam that the smaller crane had been carrying falling into the river, causing the boom of the larger crane to collapse onto the cap of pier three, pinning Snyder and knocking Pridemore into the river.

OSHA compliance officer John A. Johnson began to inspect the site the next day, in accordance with OSHA policy to inspect a work site where a fatality had occurred. Before the inspection occurred, however, the area OSHA office contacted the area MSHA office, and both determined that MSHA did not have jurisdiction at the accident site because the site was not at a mine.

Johnson visited the work site on several occasions. Following a closing conference, OSHA issued one serious citation, containing 25 separate items, and one willful citation, containing 10 items. The total proposed penalty for these violations equaled $243,500.

OSHA conducted a second inspection after receiving a complaint from Gerald Overby, the local union president. Overby reported to OSHA that employees at the work site were being lifted to their work stations underneath the bridge on the tip of a crane boom and that they were not being provided with any fall protection while they wrecked the forms underneath the bridge, even though the heights at which the employees were working ranged from 7 to 60 feet.

In response to this complaint, Johnson returned to the work site and conducted an inspection of the hazards related to the complaint. He interviewed several employees and personally observed two employees working at a height of 17 feet without any fall protection. Johnson held a closing conference for this second inspection and issued two more citations. The total proposed penalty for these violations was $100,000.

## II

To the extent this case turns on factual determinations, we review OSHRC's decision to see whether its findings are supported by substantial evidence. 29 U.S.C. § 660(a). Some confusion, however, exists as to what standard of review to use when considering

MSHA jurisdiction. *See Otis Elevator Co. v. Secretary of Labor,* 921 F.2d 1285, 1288 (D.C.Cir.1990). Most courts that have construed the statutory definitions of 30 U.S.C. § 802 to determine whether MSHA has jurisdiction over an entity or work site have not indicated what standard of review they used. But in reviewing these cases, it appears their level of scrutiny has been fairly rigorous. And one court has questioned whether the deference accorded to an agency's construction of a statute as discussed in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), applies in the context of an agency's determination of its own statutory jurisdiction. *Otis Elevator Co.,* 921 F.2d at 1288. Additionally, another court has specifically held that the standard of review is plenary. *United Energy Servs., Inc. v. FMSHA,* 35 F.3d 971, 974 (4th Cir.1994). Because we believe that OSHA had jurisdiction of the work site even if we review OSHRC's decision *de novo,* we need not decide the specific standard of review to be applied.

### III

■ The OSH Act authorizes the Secretary of Labor to set mandatory occupational safety and health standards for businesses affecting interstate commerce. *See* 29 U.S.C. § 651 *et seq.* The Act, however, exempts from the statute's reach employees who are regulated by other federal agencies.[4] 29 U.S.C. § 653(b)(1). A two-step analysis is used to determine whether OSHA jurisdiction has been preempted: (1) whether a regulation has been promulgated by a state or federal agency other than OSHA; and (2) whether the regulation promulgated covers the specific "working conditions" at issue. *Pennsylvania Elec. Co. v. FMSHRC,* 969 F.2d 1501, 1504 (3rd Cir.1992).

■ Because MSHA has promulgated regulations that are sufficiently broad to include the work site at issue, *see* 30 C.F.R. Ch. 1 (1996), OSHA would have been preempted if MSHA had jurisdiction over the work site. Thus, the dispute in this case focuses on whether the work site is a "mine"[5] because MSHA's jurisdiction reaches all "coal or other mine[s] ... and each operator of such mine." 30 U.S.C. § 803. MSHA was intended to provide a "sweeping definition" of the word "mine," encompassing much more than the usual meaning attributed to it. *Donovan v. Carolina Stalite Co.,* 734 F.2d 1547, 1551 (D.C.Cir.1984). The Act defines "coal or other mine" as follows:

(A) an area of land from which minerals are extracted in nonliquid form or, if in liquid form, are extracted with workers underground, (B) **private ways and roads appurtenant to such area,** and (C) lands, excavations, underground passageways, shafts, slopes, tunnels and workings, **structures, facilities,** equipment, machines, tools, or other property including impoundments, retention dams, and tailings ponds, on the surface or underground, **used in, or to be used in,** or resulting from, **the work of extracting such minerals from their natural deposits in nonliquid form, or if in liquid form, with workers underground, or used in, or to be used in, the milling of such minerals, or the work of preparing coal or other minerals,** and includes custom coal preparation facilities. In making a determination of what constitutes mineral milling for purposes of this chapter, the Secretary shall give due consideration to the convenience of administration resulting from the delegation to one Assistant Secretary of all authority with respect to the health and safety of miners employed at one physical establishment.

30 U.S.C. § 802(h)(1) (emphasis added).

■ BBI first argues that the bridge work site falls within the meaning of § 802(h)(1)(B) because the road being constructed was "ap-

---

4. 29 U.S.C. § 653(b)(1) provides that "[n]othing in this chapter shall apply to working conditions of employees with respect to which other Federal agencies ... exercise statutory authority to prescribe or enforce standards or regulations affecting occupational safety or health."

5. In this case, there is no dispute that BBI would be an "operator" under the statute because BBI was an "independent contractor performing ... construction." 30 U.S.C. § 802(d).

purtenant to"[6] an area of land from which minerals are extracted and that MSHA does not expressly exclude a road "just because it is public. . . . MSHA includes all roads appurtenant to an area of land from which minerals are extracted." Petitioner's Brief at 20.

Although BBI's position is not wholly without merit, since the Act is to be given a very broad reading,[7] we cannot accept BBI's reading of § 802(h)(1)(B). Not only does the statute not compel such a reading, but also such a reading is contrary to common sense. Without some limitation on the meaning of "roads appurtenant to," MSHA jurisdiction could conceivably extend to unfathomable lengths since any road appurtenant to a mine that connects to the outside world would necessarily run into yet other roads, thus becoming one contiguous road. Because of the potential reach of MSHA jurisdiction if the definition in § 802(h)(1)(B) is left unfettered, "private ways and roads" cannot simply mean "any road." Otherwise, there could conceivably be no limit to MSHA jurisdiction, a result Congress clearly did not intend.

Moreover, BBI's interpretation could lead to bizarre results. For example, if all roads appurtenant to areas of land where minerals are extracted were subject to MSHA, potentially all highway maintenance workers would be subject to MSHA regulations when maintaining roadways "appurtenant to" extraction facilities, but subject to other safety regulations when working on roadways elsewhere, leading to "duplicative jurisdiction" of workers, which could create confusion as to what safety regulations need to be followed at any

particular time, especially since "appurtenant to" is such a nebulous boundary. Such confusion, as was argued in *Otis Elevator*,[8] could lead to a decrease in safety. While this argument is not dispositive, as the court in *Otis Elevator* held that workers could be subject to duplicative jurisdiction, our case does not compel reading the statute so that all roads "appurtenant to" extraction facilities become subject to MSHA.[9] Moreover, unlike *Otis Elevator*, where miner safety was directly at issue, miner safety in situations such as the one in this case may not always be involved since not all public roadways appurtenant to mineral extraction facilities are used in mining work.

Alternatively, BBI argues that the haul road and bridge were and continued to be private up until the time of trial and thus the bridge work site fell squarely within § 802(h)(1)(B). It argues that, during its involvement with Heartland, the land on which the bridge was built was owned by Heartland or one of its sister companies and thus was not a public road. Any agreement between Heartland and the Department of Transportation, it contends, did not convey title but simply provided an opportunity for the road to become public in the future, and the status of the road in the future was irrelevant to the determination of whether MSHA had jurisdiction of the bridge construction site when the citations were issued. We disagree. The record supports OSHRC's finding that in this case, the bridge and roadway approaches should be considered

6. Because this case can be decided without determining the exact meaning of "appurtenant to," we do not address this issue.

7. *See* Federal Mine Safety and Health Amendments Act of 1977, Pub.L. No. 95–64, 1977 U.S.C.C.A.N. 3401, 3414.

8. Otis advanced the argument that permitting the Secretary to regulate Otis's employees under the Mine Act would create confusion and as a result decrease safety because the employees would be subject to MSHA at certain times and OSHA at other times. The Secretary countered by arguing that greater confusion would be created by having Otis regulated by OSHA when working in the mine while all other employees at the mine would be subject to MSHA. The court did not evaluate the merits of either claim since it felt

that the plain meaning of the statute clearly encompassed Otis's employees working at the mine site: "For present purposes, . . . we may simply observe the Secretary's account 'is at least not so unthinkable,' and Otis's account is at least not so self-evident, 'as to compel the conclusion that the [statute] does not mean what it most naturally seems to say.'" *Otis Elevator*, 921 F.2d at 1291.

9. The court in *Otis Elevator* held that the statute compelled a finding that Otis was subject to MSHA jurisdiction because § 802(d) clearly defines "operator" to include "any independent contractor performing services . . . at such mine." 921 F.2d at 1290–91.

"public." [10]

First, the contract between Heartland and the Department of Transportation provided that, upon completion, the roadway was to be conveyed to the State to become part of the state highway system and from its conception was intended for public use. Second, Heartland never prevented the public from using the bridge after the bridge had been constructed. Third, the state police regulate traffic on the bridge and it has been given a county secondary number, indicating its status as a public road. Fourth, a Department of Transportation employee had been assigned to oversee the construction of the bridge and Heartland had removed the berms at the request of the Department of Transportation because the bridge and haul road were to become a part of the county road system after their completion.

■■■■ OSHRC's finding is also supported by the ordinary meaning of a public road because the definition of a public road includes an arrangement called a "dedication." [11] A dedication is the "appropriation of land, . . . by the owner, for the use of the public, and accepted for such use by or on behalf of the public." Black's Law Dictionary 412 (6th ed.1990). A party intending to dedicate land for public use may do so by "an explicit oral or written declaration of the owner . . . of his purpose to devote the land to the public use." *Ibid.* While we recognize that the bridge had not been deeded to the state at the time of the accident, we do not believe that this dispositive. The definition of a dedication includes dedications for future use by the public: "[A] dedication of land is generally defined as its devotion to a public use by an unequivocal act of the owner . . ., manifesting an intention that it shall be . . . used presently *or in the future.*" *Seltenreich*

*v. Town of Fairbanks,* 103 F.Supp. 319, 323 (D.Alaska 1952), *aff'd,* 211 F.2d 83 (9th Cir.), *cert. denied,* 348 U.S. 887, 75 S.Ct. 206, 99 L.Ed. 697 (1954) (emphasis added). The key to a dedication is the intent of the dedicator and can be "shown by the owner's acts and declarations, or by a line of conduct the only reasonable explanation of which is that a dedication was intended." *Ibid.* It is clear from the record that Heartland intended to dedicate the bridge and haul road to the state. First, Heartland had made an agreement with the West Virginia Department of Transportation to convey the bridge and haul road to the state upon their completion. Second, Heartland manifested its intent by including in the agreement with BBI that BBI conform with the Department of Transportation's specifications and requirements.

## IV

Next, BBI argues that even if the bridge did not constitute a private way or road under the act, it was a "structure . . . or other property . . . to be used in . . . the work of extracting minerals or . . . storing, and loading of . . . coal. . . ." Petitioner's Brief at 27 (citing 30 U.S.C. § 802(h)(1) and § 802(i)). [12] BBI's argument is that the surface mine and loadout facility, which are both clearly subject to MSHA jurisdiction, cannot be separated from the haul road, and thus, must be regulated by MSHA: "[T]he physical proximity and operational integration of the haul road and the surface mine and loadout . . . permit all three facilities to be viewed as a unified, integrated coal mining operation, regardless of legal title to the premises." Petitioner's Brief at 27. BBI analogizes the haul road and bridge to a beltline system that moves coal within a mine because, like a beltline system, the haul road

---

10. Because this is essentially a determination of fact, we review OSHRC's finding to see if it is supported by substantial evidence.

11. A "public road" is defined as "[a] highway; a road or way established and adopted (or accepted as a dedication) by the proper authorities for the use of the general public, and over which every person has a right to pass and to use it for all purposes of travel or transportation to which it is adapted and devoted. The proper test in determining whether [a] road is a 'public' or

'private road' is use to which such roadway is put, and [the] fact that [the] road has been constructed at public expense is not conclusive." Black's Law Dictionary 1329 (6th ed.1990).

12. "[W]ork of preparing the coal" is defined at § 802(i) as "the breaking, crushing, sizing, cleaning, washing, drying, mixing, storing, and loading of bituminous coal, lignite, or anthracite, and such other work of preparing such coal as is usually done by the operator of the coal mine."

and bridge are the only way to move the coal from the surface mine to the loadout facility.[13] BBI argues that workers who transport the coal from the surface mine to the loadout facility using the haul road and bridge will be involved in the "work of preparing coal." Further, BBI argues that the fact that the mine was not yet operational is irrelevant since § 802(h)(1)(C) covers structures or property "to be used in" the work of preparing coal. We disagree.

Although BBI's argument is not meritless, as it is undisputed that the road and bridge will be used as Heartland's only means of getting the minerals from the surface mine to the loadout facility, BBI's analogy is not completely appropriate. The conveyor belt system can be better analogized to the tractor-trailer trucks that will be used in hauling the coal to the loadout facility. And regardless of whether the haul road and bridge are subject to MSHA jurisdiction, the tractor-trailer trucks and employees who run them will be protected by MSHA. The road and bridge can be analogized to the land underneath the conveyor belt system. We believe this analogy is better because it serves the purpose of protecting mine workers, while not subjecting all roads used for transporting coal, regardless of ownership, to MSHA jurisdiction. Moreover, unlike a conveyor, which is directly used in the "loading" of coal, a road and bridge are used in the transporting of coal, which, unlike loading, is not delineated as one of the tasks associated with the work of preparing coal. *See* 30 U.S.C. § 802(i). Additionally, it is not clear from the statute or legislative history that Congress intended to include roads within the meaning of 30 U.S.C. § 802(h)(1)(C), since Congress specifically dealt with roads in § 802(h)(1)(B). Thus, OSHRC did not err in upholding OSHA jurisdiction. MSHA did not preempt its jurisdiction.

## V

BBI also attacks the merits of the OSHA citations. First, BBI argues that the ALJ improperly relied on the Secretary's proposed penalties, failed to make an independent assessment of the penalty factors, and did not consider all of the relevant factors under 29 U.S.C. § 666(j). Second, it argues that the ALJ overlooked and misconstrued the relevant evidence pertaining to the citations. Both arguments lack merit.

The Commission has held that an ALJ may not routinely affirm the proposed penalty of the Secretary, but must make an independent determination based on factors enumerated in 29 U.S.C. § 666(j).[14] The assessment of penalties under this section, however, is within the sound discretion of the Commission. *D & S Grading Co. v. Secretary of Labor*, 899 F.2d 1145, 1148 (11th Cir.1990). In this case, the ALJ found that the Secretary had considered and properly applied the appropriate factors. He noted that the Secretary had credited the company with a 40% reduction based on its size, and appropriately refused to give further reductions under the other factors because the company "had no safety or health programs in place" at the work site and because "the

---

13. BBI notes that one court has indicated that conveyor belt systems used to transport coal, even when not entirely on mine property, can be regulated by MSHA. *See United Energy Servs.*, 35 F.3d at 971. In *United Energy Services*, an electric power company, located next to a coal mine, used coal waste, or "gob," to generate electricity. The electric company was responsible for maintaining and operating the conveyor belt system, which rested primarily on its own property, although a small portion of the system extended 300 to 500 feet into mine property. The mine employees used bulldozers to load the gob onto the conveyor belt, which then carried the gob into the power plant to be burned. MSHA cited the electric company for failing to comply with MSHA safety standards and the electric company challenged the citations, claiming that, because it was not an "operator," MSHA did not have jurisdiction over it. The Fourth Circuit disagreed, holding that not only was United Energy an operator within the meaning of the statute, but also that the "dozer trap, conveyor belt, and other equipment ... qualify as 'structures, ..., equipment, [and] machines' used in the ...'work of preparing coal.' " *Id.* at 975.

14. 29 U.S.C. § 666(j) provides that "[t]he Commission shall have authority to assess all penalties provided in this section, giving due consideration to the appropriateness of the penalty with respect to the size of the business of the employer being charged, the gravity of the violation, the good faith of the employer, and the history of previous violations."

willful items contained in both citations preclude such reductions." We find no abuse of discretion. It was within the ALJ's discretion to refuse to give reductions for good faith or prior history based on what he found the evidence in this case established. Moreover, the four factors set out in § 666(j) need not be given equal weight. And the gravity of a particular violation may warrant the assessment of the maximum penalty, even though the employer may rate perfect marks on the other three criteria. *See Secretary of Labor v. Nacirema Operating Co.,* 1 O.S.H. Cas. (BNA) 1001, 1003 (OSHRC 1972).

BBI's second argument is equally baseless. The ALJ's 94–page decision on the merits of the citations fully describes the facts leading up to the accident and surrounding the first and second investigations that led to the citations. He also dealt with BBI's affirmative and general defenses and explained his findings with respect to each of the contested citations.

## VI

For the foregoing reasons, OSHRC's findings that OSHA had jurisdiction and that the penalties assessed by the Secretary were appropriate are **AFFIRMED**.