RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 17a0031p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

MAXXIM REBUILD COMPANY, LLC,

*Petitioner,*

*v.*

FEDERAL MINE SAFETY AND HEALTH REVIEW COMMISSION; SECRETARY OF LABOR, MINE SAFETY AND HEALTH ADMINISTRATION,

*Respondents.*

┐
│
│
│
> No. 16-3530
│
│
│
┘

---

On Petition for Review from the Federal
Mine Safety and Health Review Commission.
Nos. KENT 203-566; KENT 2013-989.

Argued: February 1, 2017

Decided and Filed: February 13, 2017

Before: BATCHELDER, SUTTON, and KETHLEDGE, Circuit Judges.

---

## COUNSEL

**ARGUED:** Ralph Henry Moore, II, JACKSON KELLY PLLC, Pittsburgh, Pennsylvania, for Petitioner. Cheryl C. Blair-Kijewski, UNITED STATES DEPARTMENT OF LABOR, Arlington, Virginia, for Respondent Secretary of Labor. **ON BRIEF:** Ralph Henry Moore, II, Patrick W. Dennison, JACKSON KELLY PLLC, Pittsburgh, Pennsylvania, for Petitioner. Cheryl C. Blair-Kijewski, W. Christian Schumann, UNITED STATES DEPARTMENT OF LABOR, Arlington, Virginia, for Respondent Secretary of Labor. Mark E. Heath, SPILMAN THOMAS & BATTLE, PLLC, Charleston, West Virginia, for Amicus Curiae.

———————————

**OPINION**

———————————

SUTTON, Circuit Judge.  At issue is whether Maxxim Rebuild Company, which operates a shop that makes and repairs mining equipment, is a "coal or other mine" subject to regulation by the Federal Mine Safety and Health Review Administration.  30 U.S.C. § 802(h).  The Maxxim facility does not extract coal or any other mineral, and it does not prepare coal or any other mineral for use.  It builds and repairs mining equipment at a site that is neither adjacent to nor part of a working mine.  Because the definition of "coal or other mine" refers to locations, equipment and other things in, above, beneath, or appurtenant to active mines, the Maxxim facility is not a mine subject to the Administration's jurisdiction.  We reverse.

I.

Located in Sidney, Kentucky, the repair shop at issue makes and repairs mining equipment and machine parts.  The shop consists of two work bays:  one for welding, one for fabrication.  Maxxim employs seven workers at the Sidney shop.  Roughly 75% of the work at the shop is for equipment that Alpha Natural Resources (Maxxim's parent company) uses to extract or prepare coal at several different mines.  The rest of the work is for other mining companies and for repair shops that might sell the equipment to mining or non-mining companies.  Sidney Coal, another Alpha subsidiary, owned the property and had an office in the upper floor of the Maxxim shop.

Maxxim operates six other shops and an equipment depot in Kentucky and West Virginia.  Until this case, the Mine Safety and Health Administration had asserted jurisdiction over just one other Maxxim shop, an underground repair shop adjacent to a coal preparation plant.  The Occupational Safety and Health Administration, which oversees the safety of most workplaces in the country, regulates the other Maxxim shops.  *See* 29 U.S.C. § 651.  It previously supervised the Sidney shop employees when they did the same work in a smaller facility in Matewan, West Virginia.

The Matewan facility, like the Sidney shop, used to be connected to an active coal mine. After the Matewan coal mine stopped extracting coal, the Mine Safety and Health Administration stopped inspecting the facility. Maxxim thought the same would happen for the sealed and abandoned mine near the Sidney shop.

The Mine Safety and Health Administration kept inspecting the Sidney shop anyway. Maxxim moved into the Sidney facility in January 2012, added the second work bay, and updated the facility. An Administration inspector visited the Sidney shop in January 2013, and issued three citations. One stemmed from the absence of a written hazardous chemicals communication plan, which the Administration requires for mines. *See* 30 C.F.R. §§ 47.31–.32. The second arose from a dirty bathroom. *See id.* § 71.402(a). The third was due to an accumulation of oil, fuel, and dust on a Caterpillar 988 loader. *See id.* § 77.1104. The inspector returned in June 2013, and issued two more citations in connection with a heater and a welder.

Maxxim challenged the Mine Safety and Health Administration's power to issue the citations. An administrative law judge ruled that the Sidney shop was "a coal or other mine." *See* JA 16. So did the Commission, an independent agency responsible for reviewing the Administration's citations. *See* 30 U.S.C. § 823. Maxxim petitioned this Court for review of the Commission's decision. *See id.* § 816(a)(1).

II.

A few ground rules are in order. In reviewing decisions by the Federal Mine Safety and Health Review Commission, we defer to the Commission's fact findings if backed by "substantial evidence." *Id.*; *see Pendley v. Fed. Mine Safety & Health Rev. Comm'n*, 601 F.3d 417, 422–23 (6th Cir. 2010). And we give *Chevron* deference to the Secretary of Labor's interpretation of the Mine Act when, as happened here, the Secretary agrees with the Commission's interpretation of the Act. *Id.* at 423 & n.2. (The Secretary of Labor oversees the Mine Safety and Health Administration and the Occupational Safety and Health Administration.) As conventionally understood, *Chevron* asks two questions: Does the relevant statute answer the question at hand? If not, is the Secretary's interpretation of the statute a reasonable one? *Chevron, U.S.A., Inc. v. Nat. Res. Def. Counc., Inc.*, 467 U.S. 837, 842–43 (1984). Even though

today's dispute concerns the jurisdiction of the Commission, the same *Chevron* principles apply. *See City of Arlington v. FCC*, 133 S. Ct. 1863, 1868 (2013).

In the Secretary's view, the Mine Safety and Health Administration has exclusive jurisdiction over any facility that makes or repairs "equipment that is used in coal extraction and coal preparation activities," even a facility not a part of or adjacent to a working mine. Respondents' Br. 20. In supporting this position, the Secretary asks us to focus on these words in one of the Mine Act's jurisdictional provisions: that its authority extends to "facilities" and "equipment . . . used in, or to be used in . . . the work of preparing coal or other minerals." 30 U.S.C. § 802(h)(1).

But context and perspective are everything. In pulling back the lens, we see several indications that the power of the Mine Safety and Health Administration extends only to such facilities and equipment if they are in or adjacent to—in essence part of—a working mine.

Start with what § 802(h)(1) defines: a "coal or other mine." The term is locational. And the location concerns mines. Equipment by itself tells us nothing about where it is. And a facility by itself does not say anything about whether it is connected to a mine. As the title of the Act (the Federal *Mine* Safety and Health Act) and the title of the pertinent agency (the *Mine* Safety and Health Administration) suggest, the definition of "coal or other mine" relates to a place—land and things in or connected to a mine.

Now pull back the lens to the full definition from which the Secretary extracts these words. Even if we italicize the chosen words, they take on a different hue in context. Section 802(h)(1)(C) defines "coal or other mine" as "lands, excavations, underground passageways, shafts, slopes, tunnels and workings, structures, *facilities, equipment*, machines, tools, or other property including impoundments, retention dams, and tailings ponds, on the surface or underground, *used in, or to be used in*, or resulting from, *the work of extracting* such *minerals* from their natural deposits . . ., or used in, or to be used in . . . the work of preparing coal or other minerals." The definition is broad, sure enough. It's as if the author went to a mine and wrote down everything he saw in, around, under, above, and next to the mine. Even then, the definition still extends only to everything that one would see in or around a working mine.

It does not cover mining "equipment" or for that matter mining "machines, tools, or other property" wherever they may be found or made.

Words, like people, "are known by their companions." *Gutierrez v. Ada*, 528 U.S. 250, 255 (2000); *see* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* § 31 (2012). The definition of "coal or other mine" has two linking concepts. One relates to mine-related places: "lands, excavations, underground passageways, shafts, slopes, tunnels and workings, structures, [and] facilities . . . , used in or to be used in . . . extracting . . . minerals." The other relates to mine-related things that serve a mine-related function in those places: "equipment, machines, tools, or other property . . . used in or to be used in" the same process: "extracting . . . minerals." Both concepts are joined together by their connection to a working mine—places and things in or around the mine. Just as these words do not cover "lands" disconnected from an active mine (even lands that might one day be purchased "to be used" as a mine), they do not cover equipment that is not part of a working mine (even equipment that might one day be sold to someone "to be used" in a mine). Whether it's a place or functional thing, it must be connected to a working mine.

Now pull back the lens one frame further. Section 802(h)(1) provides three pertinent jurisdictional definitions, not just one—a perspective that casts more light on § 802(h)(1)(C):

> (h) (1) "coal or other mine" means (A) an area of land from which minerals are extracted in nonliquid form or, if in liquid form, are extracted with workers underground, (B) private ways and roads appurtenant to such area, and (C) lands, excavations, underground passageways, shafts, slopes, tunnels and workings, structures, facilities, equipment, machines, tools, or other property including impoundments, retention dams, and tailings ponds, on the surface or underground, used in, or to be used in, or resulting from, the work of extracting such minerals from their natural deposits in nonliquid form, or if in liquid form, with workers underground, or used in, or to be used in, the milling of such minerals, or the work of preparing coal or other minerals, and includes custom coal preparation facilities. In making a determination of what constitutes mineral milling for purposes of this chapter, the Secretary shall give due consideration to the convenience of administration resulting from the delegation to one Assistant Secretary of all authority with respect to the health and safety of miners employed at one physical establishment.

Note that the other definitions in the Mine Act portray a mine as a place. One says that it is "an area of land from which minerals are extracted in nonliquid form or, if in liquid form, are extracted with workers underground." § 802(h)(1)(A). The other says "private ways and roads appurtenant to such area." § 802(h)(1)(B). Location, location, location: All three definitions are place connected and place driven.

Now pull back the lens to put the definition of "coal or other mine" in the context of adjacent definitions.

> (d) "operator" means any owner, lessee, or other person who operates, controls, or supervises a coal or other mine or any independent contractor performing services or construction at such mine;
> (e) "agent" means any person charged with responsibility for the operation of all or a part of a coal or other mine or the supervision of the miners in a coal or other mine; . . .
> (g) "miner" means any individual working in a coal or other mine;
> (h) (1) "coal or other mine" means (A) an area of land from which minerals are extracted in nonliquid form or, if in liquid form, are extracted with workers underground, (B) private ways and roads appurtenant to such area, and (C) lands, excavations, underground passageways, shafts, slopes, tunnels and workings, structures, facilities, equipment, machines, tools, or other property including impoundments, retention dams, and tailings ponds, on the surface or underground, used in, or to be used in, or resulting from, the work of extracting such minerals from their natural deposits in nonliquid form, or if in liquid form, with workers underground, or used in, or to be used in, the milling of such minerals, or the work of preparing coal or other minerals, and includes custom coal preparation facilities. In making a determination of what constitutes mineral milling for purposes of this chapter, the Secretary shall give due consideration to the convenience of administration resulting from the delegation to one Assistant Secretary of all authority with respect to the health and safety of miners employed at one physical establishment;
>      (2) For purposes of subchapters II, III, and IV, "coal mine" means an area of land and all structures, facilities, machinery, tools, equipment, shafts, slopes, tunnels, excavations, and other property, real or personal, placed upon, under, or above the surface of such land by any person, used in, or to be used in, or resulting from, the work of extracting in such area bituminous coal, lignite, or anthracite from its natural deposits in the earth by any means or method, and the work of preparing the coal so extracted, and includes custom coal preparation facilities;
> (i) "work of preparing the coal" means the breaking, crushing, sizing, cleaning, washing, drying, mixing, storing, and loading of bituminous coal, lignite, or

anthracite, and such other work of preparing such coal as is usually done by the operator of the coal mine.

§ 802.

Witness first the definitions of "operator" and "agent" and "miner." All three are defined in relation to working mines. And this repair shop was not attached to or adjacent to a working mine. Then see the pertinent definition of "coal mine" in § 802(h)(2), which applies to other federal programs such as the Black Lung Benefits Act. Here too the definition has a locational focus. It limits the agency's authority to land and property connected to a mine, not to land, facilities, or equipment that might someday be used in connection with a coal mine. Taken together, each of these surrounding provisions teaches a lesson taught many times before. "A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme [] because the same terminology is used elsewhere in a context that makes its meaning clear or because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law." *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Inc.*, 484 U.S. 365, 371 (1988) (quotation omitted).

Now pull back the lens to account for other provisions in this title. Congress, it turns out, separately gave the Mine Safety and Health Administration authority to regulate *equipment* sold to mines, *see* 30 U.S.C. § 820(h), the most natural home for regulating mining equipment unconnected to a working mine. But the provision does not apply in this setting. And the agency indeed did not cite Maxxim for equipment violations. It cited the repair shop for alleged problems with bathrooms, welders, loaders, heaters, and safety plans. Not one of those things is equipment sold to Alpha.

What the agency complained about, it turns out further, is covered by a related agency, also under the umbrella of the Secretary of Labor: the Occupational Safety and Health Administration. *See* 29 U.S.C. §§ 651, 653. The point of the Occupational Safety and Health Administration is to regulate these kinds of safety and health matters, as its name suggests. Yet if we uphold the Secretary's and Commission's position, that would give the Mine Safety and Health Administration exclusive jurisdiction over the entirety of the Maxxim facility. *See Bush & Burchett, Inc. v. Reich*, 117 F.3d 932, 936 (6th Cir. 1997); *Otis Elevator Co. v. Sec'y of Labor*,

921 F.2d 1285, 1287 (D.C. Cir. 1990) (Thomas, J.). This is not a case in which the regulated entity seeks to hide from *any* regulation. It just thinks, quite reasonably, that the Secretary's authority applies to it through the Occupational Safety and Health Administration, not the Mine Safety and Health Administration.

We are not alone in distinguishing manufacturers and repairers of mining equipment from the mines that use that equipment. A utility company that sells electricity and visits mines monthly to read and update its meters is not a mine operator. *Old Dominion Power Co. v. Donovan*, 772 F.2d 92, 93, 96 (4th Cir. 1985). A mining engineer who works in an office and at other locations where no mineral extraction takes place is not a miner. *Paul v. Fed. Mine Safety & Rev. Comm'n*, 812 F.2d 717, 717–18, 720 (D.C. Cir. 1987). And a manufacturer that sells and delivers steel products to a mine is not a mine operator. *N. Ill. Steel Supply Co. v. Sec'y of Labor*, 294 F.3d 844, 845, 849 (7th Cir. 2002).

The Alpha mines are "one-step removed from" the Maxxim repair shop, and it makes no difference that Alpha may one day use the shop's fabricated or repaired equipment "to perform work directly on the extracted coal." *Dir., Office of Workers' Comp. Programs, U.S. Dep't of Labor v. Ziegler Coal Co.*, 853 F.2d 529, 536 (7th Cir. 1988). In point of fact, *Ziegler Coal Co.* dealt with a facility similar to the one in this case—a repair shop "located approximately one and one-half miles away from the nearest Ziegler coal mine"—and the Seventh Circuit nonetheless ruled that the repair shop was not a mine. *Id.* at 531, 536–37.

When government lawyers seek *Chevron* deference, the question is not whether they can identify an ambiguity, any ambiguity, in the words of a statute. The question is whether they can identify a competing reasonable interpretation of the statute. *See Henry Ford Health Sys. v. Dep't of Health & Human Servs.*, 654 F.3d 660, 664 (6th Cir. 2011). But the Secretary's competing interpretation of § 802(h)(1)(C) is not a reasonable one—and not just because it overlooks all of the textual and precedential clues identified above. The Secretary's interpretation also has no stopping point.

Consider how the Secretary's position would have applied to the late, but once formidable, Jeffrey Mining Manufacturing Company. Founded in 1876, it was once the largest

maker of underground coal mining equipment in the four States of the Sixth Circuit, and indeed was once the largest such manufacturer in the world. Robert H. Jeffrey, *Address at the Columbus Historical Society: Jeffrey's Manufacturing History in Columbus* 2, 4, 10, 12 (Sept. 26, 2002), https://www.jeffreyco.com/docs/Short_History.pdf. The manufacturing plant and repair shops were based in Columbus, Ohio, and were not remotely near any working mine. Yet the Secretary's position—that any "facility" that makes "equipment" that is "used" or "to be used" in a coal mine *is* a coal mine—would have transformed that plant into a coal mine. Congress deserves more credit than that. The statute is "tailored to the dangers that arise from handling coal" and other minerals, not the generic dangers of making mining equipment. *Power Fuels, LLC v. Fed. Mine Safety & Health Rev. Comm'n*, 777 F.3d 214, 217 (4th Cir. 2015).

Even the Mine Safety and Health Administration seems to doubt its assumption of authority. In practice, it has not shown the courage of today's convictions. It has not asserted jurisdiction over five other Maxxim shops or the Maxxim equipment depot that sells loaders and other machines to mining companies. Like the Sidney shop, those shops are not locations where coal is extracted or prepared. The Administration did there what it should have done here: leave any such regulation to the Occupational Safety and Health Administration.

In advancing a contrary position, the Secretary leans heavily on another decision of the Commission: *Secretary of Labor, Mine Safety & Health Administration v. Jim Walter Resources, Inc.*, 22 F.M.S.H.R.C. 21 (2000). *Jim Walter* held that an off-site supply shop, which stored hard hats, safety glasses, nails, conveyor belts, belt structures, oil filters, and other supplies exclusively for the use of the shop's parent company, was a "coal or other mine." *Id.* at 22, 25. We disagree. For the same reasons we reject the Commission's decision here, we reject *Jim Walters* as well. We of course are not bound by an incorrect Commission decision. Once the agency tries to extend its jurisdiction to off-site shops and off-site equipment, the language of the statute provides no stopping point, leaving the scope of its jurisdiction to the whims of the Secretary. Far better, it seems to us, to stand by the text and context of § 802(h)(1), which limit the agency's jurisdiction to locations and equipment that are part of or adjacent to extraction, milling, and preparation sites.

Alpha, it is true, needs facilities like Maxxim's to repair equipment and manufacture new parts. But that reality does not transform the Sidney shop into a mine any more than it could have transformed the Jeffrey Company plant into a mine in the past or a Caterpillar plant into a mine in the future. Our court rejected a similar argument in the context of a road and bridge constructed by a mining company. Even though the road and bridge were the "only means of getting the minerals from the surface mine to the loadout facility" and even though they were used in the process, that did not make them mines under § 802(h)(1)(C). *Bush & Burchett*, 117 F.3d at 939. A similar conclusion applies here.

For these reasons, we grant the petition for review and reverse the Commission's decision to exercise jurisdiction over the Maxxim facility.