# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued May 12, 2009　　　　　　　Decided July 21, 2009

No. 08-1312

SECRETARY OF LABOR, MINE SAFETY AND HEALTH
ADMINISTRATION,
PETITIONER

v.

NATIONAL CEMENT COMPANY OF CALIFORNIA, INC., ET AL.,
RESPONDENTS

———

On Petition for Review of a Decision
of the Federal Mine Safety and Health Review Commission

———

*Robin A. Rosenbluth*, Attorney, Mine Safety & Health
Administration, argued the cause for petitioner. With her on
the briefs were *Carol A. De Deo*, Deputy Solicitor, and *W.
Christian Schumann*, Counsel.

*Margaret Lopez* argued the cause for respondent National
Cement Company of California, Inc. With her on the brief
was *Michael T. Heenan*.

*Daniel W. Wolff* argued the cause for respondent Tejon
Ranchcorp. With him on the brief was *Thomas C. Means*.

Before: TATEL, GARLAND, and GRIFFITH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* GRIFFITH.

GRIFFITH, *Circuit Judge*: The Secretary of Labor, acting through the Mine Safety and Health Administration, cited the National Cement Company of California for its failure to install guardrails along a private road leading to its cement plant. The question before us is whether MSHA has jurisdiction over the road. The answer depends on whether the road falls within the definition of "mine" in the Federal Mine Safety and Health Act of 1977 (Mine Act), Pub. L. No. 95-164, § 102(b)(3), 91 Stat. 1290, 1290 (codified at 30 U.S.C. § 802(h)(1)). We hold that the Secretary's view that it does is a reasonable interpretation of the statute and remand this matter for proceedings on the merits of the citation.

## I.

### A.

The Mine Act requires the Secretary of Labor to develop and promulgate mandatory safety and health standards for the nation's mines. *See* 30 U.S.C. § 811 (2006). MSHA, acting on behalf of the Secretary, ensures compliance with these standards by, among other things, conducting regular mine inspections and issuing citations to noncompliant mine operators. *See id.* §§ 813(a), 814(a). A mine "operator" is "any owner, lessee, or other person who operates, controls, or supervises a . . . mine."[1] *Id.* § 802(d). A "mine" is defined as

> (A) an area of land from which minerals are extracted . . . , (B) private ways and roads appurtenant to such

---

[1] The Mine Act defines "person" broadly, as "any individual, partnership, association, corporation, firm, subsidiary of a corporation, or other organization." *Id.* § 802(f).

area, and (C) lands, excavations, underground passageways, shafts, slopes, tunnels and workings, structures, facilities, equipment, machines, tools, or other property . . . used in . . . the work of extracting such minerals . . . , or used in . . . the milling of such minerals . . . .

*Id.* § 802(h)(1).

The Federal Mine Safety and Health Review Commission is an independent adjudicatory body that resolves disputes arising under the Mine Act. *See id.* §§ 815, 823. Mine operators may contest MSHA citations before a Commission-appointed administrative law judge, *id.* § 823(d)(1), and any person aggrieved by an ALJ's decision is entitled to request Commission review, *id.* § 823(d)(2)(A). Persons aggrieved by an order of the Commission may obtain judicial review in an appropriate court of appeals. *See id.* § 816(a)–(b).

**B.**

The National Cement Company of California owns and operates a cement processing plant located on the southern portion of a 270,000-acre ranch owned by Tejon Ranchcorp.[2] National Cement occupies the land pursuant to a lease agreement that includes an easement to use an access road that runs 4.3 miles north from State Route 138 to the cement plant. The access road is the only paved road that runs from the state highway to the plant. Under the terms of the easement, only National Cement, Tejon, and persons

---

[2] The facts of this case are largely undisputed and have been set forth in our prior decision regarding this matter. *See Sec'y of Labor v. Nat'l Cement Co. of Cal.*, 494 F.3d 1066, 1068–73 (D.C. Cir. 2007). We describe them here only to the extent necessary to provide context for our decision.

authorized by the State of California may use the access road. Signs posted at the entrance from the highway and along the initial segment of the road provide notice of this restriction. National Cement has built a guardhouse and gate where the road ends at its facility.

Most of the traffic along this access road is related to the cement plant. National Cement's customers, contractors, vendors, and employees use the road to travel to and from the plant, which operates continuously, and heavy trucks drive on the road day and night for more than 45,000 round trips a year. But as one of the few paved roads on the ranch, the access road is also used on occasion by Tejon and its associates for purposes unrelated to mining. The Federal Aviation Administration uses the road to reach a communications tower, and the California Department of Water Resources uses the road to maintain an aqueduct and bridge.

The lease agreement grants National Cement the right to alter, maintain, and repair the access road, and National Cement has generally kept the road in useable condition without seeking Tejon's permission. Past maintenance includes resurfacing, resealing, and repaving the road, as well as installing speed bumps and speed limit signs. National Cement has not, however, installed protective barriers on sections of the road by drop-offs—an omission that led MSHA to cite the company for violating 30 C.F.R. § 56.9300(a), which states: "Berms or guardrails shall be provided and maintained on the banks of roadways where a drop-off exists of sufficient grade or depth to cause a vehicle to overturn or endanger persons in equipment."[3]

---

[3] MSHA first cited National Cement for its failure to install berms or guardrails in March 1992. A month later, MSHA vacated the

National Cement challenged the citation, and Tejon intervened in support. The ALJ granted the Secretary's motion for summary judgment that MSHA has jurisdiction over the road, ruling that the road is a mine under subsection (B) of the Mine Act's definition of that term because it is a private road appurtenant to an extraction area. *See Nat'l Cement Co. of Cal. v. Sec'y of Labor*, 27 F.M.S.H.R.C. 84, 99 (2005). The Commission ordered interlocutory review and vacated the ALJ's decision, concluding that the Secretary's interpretation of subsection (B) would lead to results that are absurd or inconsistent with the purpose of the Mine Act. *See Sec'y of Labor v. Nat'l Cement Co. of Cal.*, 27 F.M.S.H.R.C. 721, 728, 735 (2005). The Commission determined that only those sections of the access road over which National Cement and its customers have exclusive use can be considered "appurtenant" to an extraction area and remanded the matter for the ALJ to determine whether any such section exists. *Id.* at 735.

The Secretary responded by filing the first of two petitions for review in this court, arguing that subsection (B) unambiguously includes the access road. We disagreed, concluding that the statute is not clear on the issue. *See Sec'y of Labor v. Nat'l Cement Co. of Cal*., 494 F.3d 1066, 1074 (D.C. Cir. 2007). We noted that under subsection (B), a road

---

citation on the erroneous belief that the access road was a public highway and National Cement had no control over personnel using the roadway until they arrived at the mine site. On February 13, 2003, a MSHA inspector issued another citation to National Cement for its failure to install berms or guardrails. In late 2003, MSHA made clear it had authority to regulate the road but vacated the citation because National Cement had inadequate notice that the road was subject to its jurisdiction. On February 9, 2004, MSHA issued the citation that is the subject of this action.

is a mine if it meets two criteria: it must be (1) "private" and (2) "appurtenant to" an extraction area. *Id.* We also pointed out that each of these terms is capable of a broad reading and a narrow reading. "Private" means "intended for or restricted to the use of a particular person or group or class of persons . . . ." *See id.* (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1804–05 (1993)). This could be read broadly to mean use restricted to "a particular . . . group or class of persons," or it could be read narrowly to mean use restricted to "a particular person." *Id.* "Appurtenant" means "a: annexed or belonging legally to some more important thing (a right-of-way—to land or buildings); b: incident to and passing in possession with real estate—used of certain profits or easements." *See id.* (quoting WEBSTER'S THIRD at 107). This definition, we stated, could be read broadly to encompass easements benefiting some "more important thing" or more narrowly to include only easements dedicated exclusively to use by some more important thing. *See id.* We determined that although the broad readings of "private" and "appurtenant" would cover the access road, the narrow readings would not. *Id.*

Because the Secretary failed to recognize this ambiguity in subsection (B) and erroneously thought its meaning was plain, we could not defer to her interpretation. *Id.* at 1075 ("[D]eference is reserved for those instances when an agency recognizes that the Congress's intent is not plain from the statute's face." (quoting *Peter Pan Bus Lines, Inc. v. Fed. Motor Carrier Safety Admin.*, 471 F.3d 1350, 1354 (D.C. Cir. 2006))). We vacated the Commission's decision and remanded the matter "for [the Commission] to obtain from the Secretary a *Chevron* step 2 interpretation" made in light of the statute's possible meanings. *Id.* at 1077. We also observed that the Secretary's broad interpretation of subsection (B) raised three concerns about how the exercise of MSHA's

jurisdiction over the access road might relate to the Mine Act's overall enforcement scheme. First, does National Cement, which does not own the road, have authority to alter the road as MSHA might require? Second, would National Cement be responsible for all road users, not just those it controlled? Third, would MSHA jurisdiction extend to those with no connection to the cement plant but who exert some control over the access road? *See id.* at 1075–76. We instructed the Secretary to address these questions on remand and explain how her interpretation of subsection (B) could be harmonized with the Act's enforcement provisions.[4]

On remand, the Secretary took the view that "private" roads are those restricted to a particular group or class of persons (not to a particular person) and that "appurtenant to" requires only that the road belong and provide a right of way to some more important thing (not dedicated exclusively to use by some more important thing). *See Sec'y of Labor v. Nat'l Cement Co. of Cal.*, 30 F.M.S.H.R.C. 668, 672 (2008); *see also* Br. of Sec'y at 23–26. Under those broad readings, the Secretary concluded once again that the access road is a mine because its use is limited to a particular group of persons, making it "private," and it is subject to a transferable easement benefitting National Cement's plant, making it "appurtenant to" an extraction area. The Secretary tried to address our concerns by explaining that she would apply

---

[4] Judge Rogers dissented, finding the text of subsection (B) unambiguous and suggesting that the court "improperly relie[d] upon policy considerations to find ambiguity where there is none." *Id.* at 1077 (Rogers, J., dissenting). The cement plant is an extraction area and, according to Judge Rogers, the access road is both "private" and "appurtenant to" the cement plant. *Id.* at 1077–78. Judge Rogers also found it consistent with the history and purpose of the Act to interpret "mine" to include the access road. *Id.* at 1078–80.

subsection (B) to the road itself and subsection (C), which covers equipment used in mining, to those vehicles that use the road to support mining activity. *See Nat'l Cement*, 30 F.M.S.H.R.C. at 672, 675–78. Under this interpretation, the Secretary would hold National Cement responsible only for the conditions of the road itself and for vehicles on the road that are under its control and covered by subsection (C) as mining equipment.

The Commission again found the Secretary's interpretation unreasonable and vacated the citation. It considered the Secretary's use of subsection (C) a contravention of the Act because it seemed to limit the reach of subsection (B) to only certain kinds of road uses. *See id.* at 676–77. According to the Commission, subsection (C) is "clear" and "has been interpreted to plainly mean that Mine Act jurisdiction extends beyond subsections (A) and (B) . . . ." *See id.* at 675. The Commission also determined that the Secretary's view did "not do nearly enough to prevent MSHA jurisdiction from potentially attaching to the possible non-mine uses of the Access Road should the road be subject to MSHA regulation as a mine." *Id.* at 678. Thus the Commission concluded that the Secretary's interpretation not only misconstrued the statute but failed to address our concerns.

The Secretary has again petitioned for review, arguing that her interpretation of subsection (B) is reasonable. We have jurisdiction to consider her petition under 30 U.S.C. § 816(b).

## II.

As noted, previously we held that it is not clear subsection (B) covers the access road. *See Nat'l Cement*, 494

F.3d at 1077. Accordingly, we proceed to *Chevron* step two and determine whether the Secretary's interpretation of that provision, advanced in this litigation, is reasonable. *See Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984); *see also Sec'y of Labor v. Excel Mining, LLC*, 334 F.3d 1, 6 (D.C. Cir. 2003) ("'[T]he Secretary's litigating position before [the Commission] is . . . an exercise of [her] delegated lawmaking powers' . . . and is therefore deserving of deference." (quoting *RAG Cumberland Res. LP v. FMSHRC*, 272 F.3d 590, 596 n.9 (D.C. Cir. 2001)) (second alteration in original)).

Tejon asserts that *Chevron* does not apply because the Secretary failed to "follow[] this Court's remand mandate." Br. of Tejon at 12. Rather than harmonizing her interpretation of subsection (B) with the overall enforcement scheme of the Mine Act, so the argument goes, the Secretary "engage[d] in interpretative alchemy" and created "an entirely new rationalization for her actions." *Id.* at 12–13. As Tejon sees it, her "ever-shifting" reasoning "is nothing more than a post-hoc rationalization." *Id.* at 13–16.

Distilled from its rhetoric, Tejon is making two separate but related points: that the Secretary impermissibly changed both the rationale for the citation and her interpretation of subsection (B). But the Secretary's rationale on remand used the same reasoning for citing National Cement as the first instance. The access road fell within the definition of a mine under her broad reading of subsection (B). Tejon is correct that the Secretary read subsection (B) differently in response to our concern that her broad interpretation might extend MSHA jurisdiction in problematic ways. She had originally interpreted subsection (B) to cover private roads appurtenant to extraction areas and everything on those roads. *See Nat'l Cement*, 494 F.3d at 1075–76; *see also* Reply Br. of Sec'y at

8. This interpretation tracked her longstanding view that subsection (A) covers extraction areas and everything within their boundaries. *See* Br. of Sec'y at 28. But now the Secretary interprets subsection (B) to cover the access road but not the vehicles on it. A change in interpretation, however, is no reason to withhold *Chevron* deference provided the agency explained the basis for its reconsidered view. *See Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981–82 (2005). The reason for the Secretary's change is obvious. Following our directions, she tried to read subsection (B) in a way that addressed our concerns and still made sense within the overall enforcement scheme of the Mine Act. *See Nat'l Cement*, 30 F.M.S.H.R.C. at 672; *cf. FCC v. Fox Television Stations, Inc.*, No. 07-582, slip op. at 10–11 (U.S. 2009) (stating that an agency changing course must ordinarily "display awareness that it *is* changing position" but "need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one").

Tejon also argues that *Chevron* does not apply because the Secretary's interpretation of subsection (B) does not reflect a "policy choice." Br. of Tejon at 48–52. Assuming for the sake of argument that such a rule exists, the Secretary's decision to adopt the broad interpretation of subsection (B) clearly involves a policy choice at the core of her regulatory mission under the Mine Act. Congress directed the Secretary to protect the safety and health of the nation's miners. *See* 30 U.S.C. § 801. The Secretary's interpretation of subsection (B) to encompass roads, like the access road, that have a significant connection to mining implements this policy. *Cf. Otis Elevator Co. v. Sec'y of Labor*, 921 F.2d 1285, 1291 (D.C. Cir. 1990) (calling the decision to subject non-mine personnel who are servicing mine elevators to MSHA

jurisdiction "the kind of expert policy judgment" courts are "ill-equipped to make").

Accordingly, the Secretary's interpretation of subsection (B) is entitled to *Chevron* deference.

## III.

Applying the standard of review called for by *Chevron* step two, we ask in Part A whether the Secretary has advanced a reasonable interpretation of subsection (B). In Part B, we consider whether the Secretary adequately addressed the concerns we raised when this matter was last before us.

## A.

Subsection (B) provides that "private ways and roads appurtenant to [extraction areas]" are "mines." 30 U.S.C. § 802(h)(1)(B). On remand the Secretary adopted the broad reading of this provision to bring the access road within MSHA's jurisdiction. We held before that such a reading was not inconsistent with the language of subsection (B) and we will not revisit that decision. *See PNC Fin. Servs. Group, Inc. v. Comm'r*, 503 F.3d 119, 126 (D.C. Cir. 2007) ("[W]hen a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." (quoting *Arizona v. California*, 460 U.S. 605, 618 (1983))).

But there is more to the matter. We also expressed concern whether a broad reading of "private" and "appurtenant," although consistent with the wording of subsection (B), could be harmonized with the Mine Act's overall enforcement scheme. For example, we wondered if operators of roads used for both mining and non-mining

purposes would be responsible for all road users. *See Nat'l Cement*, 494 F.3d at 1075–76. The Secretary tried to address this concern by reinterpreting subsection (B) to cover roads but not the vehicles on them. National Cement and Tejon assert that the Secretary cannot limit subsection (B) in this way. This is an odd argument coming from these parties, whose effort throughout this litigation has been to oppose the extension of MSHA's jurisdiction to the access road. Yet now they argue that subsection (B) compels a more expansive interpretation of MSHA's jurisdiction than that advanced by the Secretary on remand. Of course, their intent is to show there is no reasonable interpretation of subsection (B) that covers the access road. In their view, subsection (B) necessarily includes vehicles, such that the Secretary's broad reading cannot avoid the problem we raised. Operators of roads not used exclusively for mining purposes will be responsible for non-mining vehicles outside of their control. This, they claim, is unreasonable, as our previous opinion suggested, leaving the Secretary no choice but to adopt the narrow reading of subsection (B) in which only private roads used exclusively by mining vehicles fall within the jurisdiction of MSHA.

We must thus consider whether the Secretary acted reasonably in reinterpreting subsection (B) to cover the road but not vehicles. The parties' arguments highlight three distinct questions for us to consider. Is the Secretary's decision to exempt vehicles consistent with the language of subsection (B)? Is it reasonable for the Secretary to interpret subsection (B) differently than (A)? And is the Secretary's reliance on subsection (C) to cover mining-related vehicles on the road a permissible construction of the statute? We take each question in turn.

First, the Secretary argues that we must defer to her interpretation that subsection (B) does not cover vehicles on the access road because the statute is not clear on that point. We agree. National Cement and Tejon argue that the phrase "ways and roads," like the term "area" in subsection (A), is geographically "all-encompassing" and covers everything on the road. *See, e.g.*, Br. of Nat'l Cement at 29–31. Perhaps. But the Secretary's view is also reasonable and has the added virtue of being more consistent with the common meaning of "road," which is not normally used to refer to both the road itself and the vehicles traveling on it, *see* WEBSTER'S THIRD at 1963 (defining "road" as "an open way . . . for vehicles [and] persons").

Second, we also find reasonable the Secretary's decision to interpret subsection (B) to cover roads but not vehicles even though she interprets subsection (A) to cover extraction areas and everything within their boundaries. In subsection (A), Congress provided that a "mine" is an "area of land from which minerals are extracted." 30 U.S.C. § 802(h)(1)(A). The Secretary interprets the word "area" in this provision as all-encompassing because "virtually everything in an extraction area . . . is necessarily related to [mining] activity," Br. of Sec'y at 30–31. The same is not true, however, for private roads appurtenant to extraction areas. As demonstrated by the facts of this case, vehicles on such roads may have no connection to mining, making it sensible to exclude them from MSHA's jurisdiction under subsection (B). Subsection (A) concerns an area of land in which almost everything is dedicated to mining. Subsection (B) does not. It was reasonable for the Secretary to adopt different interpretations for different things. *Cf. Atl. Cleaners & Dyers, Inc. v. United States*, 286 U.S. 427, 433 (1932) (stating that the same words in a statute may be interpreted differently "[w]here the subject matter to which the words refer is not the same").

And third, we conclude that the Secretary's view that subsection (C) covers mining-related vehicles traveling on mining roads is also reasonable. Subsections (B) and (C) can be read to work in tandem. Because subsection (C), which covers mining-related equipment, clearly encompasses mining vehicles, it is reasonable to read (B) in a way that does not. *See Qi-Zhuo v. Meissner*, 70 F.3d 136, 139 (D.C. Cir. 1995) ("An endlessly reiterated principle of statutory construction is that all words in a statute are to be assigned meaning, and that nothing therein is to be construed as surplusage."). National Cement and Tejon argue that subsection (C) is intended to continue the expansion of MSHA jurisdiction beyond the geographic bounds of (A) and (B), and the Secretary cannot use subsection (C) to limit the reach of (B). But their argument rests on a mistaken premise. Under the Secretary's interpretation, subsection (C) actually works to expand MSHA jurisdiction. Subsection (A) confers jurisdiction over extraction areas and all activities within their boundaries. Subsection (B) extends jurisdiction to private roads appurtenant to extraction areas, and subsection (C) reaches vehicles used in mining but not located within an extraction area. The Secretary's construction of subsections (B) and (C) is entirely consistent with a broad statutory definition of "mine," which extends the protections of the Mine Act beyond the actual site where mining takes place.

Accordingly, we hold that the Secretary has provided a reasonable interpretation of subsection (B) that is entitled to *Chevron* deference.

**B.**

We now ask whether the Secretary has adequately explained how her broad interpretation of subsection (B) can

be harmonized with the Mine Act's enforcement scheme. In our prior opinion, our first concern was that National Cement would lack authority to alter the road as the Secretary might direct. *See Nat'l Cement*, 494 F.3d at 1075. The Secretary notes, however, that liability under the Mine Act is dependent upon a finding of control: only mine "operators" can be cited and held liable for violations. *See* 18 U.S.C. §§ 802(d), 814(a); *Sec'y of Labor v. Berwind Natural Res. Corp.*, 21 F.M.S.H.R.C. 1284, 1293 (1999) (stating that to be an "operator," an entity must have "substantial involvement" in the operation of the mine). In other words, an entity cannot be held liable unless it "operates, controls, or supervises" the mine. 18 U.S.C. § 802(d). For example, "if National Cement does not have the requisite control over the road to install berms or guardrails, it is not an 'operator' and cannot be cited for a violation of the berm or guardrail requirement." Br. of Sec'y at 38. Tejon argues that the Secretary's response ignores the longstanding rule that mine operators are subject to strict liability for violations of MSHA standards. *See* Br. of Tejon at 18 (citing *Sec'y of Labor v. Twentymile Coal Co.*, 456 F.3d 151 (D.C. Cir. 2006)). But strict liability means liability without fault. W. PAGE KEETON, PROSSER & KEETON ON THE LAW OF TORTS 534 (5th ed. 1984). It does not mean liability for things that occur outside one's control or supervision. The Secretary's response alleviates our first concern.

Our second concern was that the Secretary may hold National Cement responsible for all users of the road, including those over whom it has no authority or control. *See Nat'l Cement*, 494 F.3d at 1075–76. Under the Mine Act, a determination that a property is a mine entails significant consequences for mine operators. For example, mine operators must comply with withdrawal orders and remove "all persons" from specified areas upon MSHA's request, *see,*

*e.g.*, 30 U.S.C. § 814(b), (d), (e); they must provide site-specific hazard awareness training to any person present at a "mine site," 30 C.F.R. § 46.11(b); and, in the event of an accident, they must notify the Secretary and take appropriate measures to prevent the destruction of relevant evidence, *see* 30 U.S.C. § 813(j). *See also Nat'l Cement*, 494 F.3d at 1075–76 (explaining enforcement scheme). The Secretary assures us she will not interpret these provisions in a way that requires National Cement to take unreasonable measures or act beyond its authority. *See* Br. of Sec'y at 40–47. For example, in the event of a withdrawal order the Secretary states she will only require National Cement to withdraw those persons over whom it has control. She argues that the statutory requirement to withdraw "all persons" can be met by ordering Tejon to withdraw anyone else on the road solely within its control. Likewise, the Secretary will not require National Cement to provide site-specific training to persons whose only contact with the mine is their use of the access road because she interprets the phrase "mine site" to refer only to extraction areas, not roads appurtenant to such areas. The Secretary will, however, require National Cement to take reasonable and necessary actions within its control, such as immediately reporting to MSHA road accidents involving death or the possibility of death.

By explaining how her reading of subsection (B) makes sense within the enforcement provisions we identified, the Secretary has addressed our concern. We will not declare the Secretary's interpretation of subsection (B) unreasonable simply because there is a remote chance it may lead to problematic results with regard to a small subset of the Mine Act's enforcement provisions. Congress defined private roads appurtenant to extraction areas as mines. The question before us is whether the Secretary's interpretation of this provision is reasonable. Not only is the Secretary's interpretation

consistent with the statute's language, it is perfectly aligned with a key objective of the Mine Act. The Secretary must act to ensure the "health and safety of [the mining industry's] most precious resource—the miner." 30 U.S.C. § 801(a). By extending MSHA jurisdiction to roads that, like the access road, are plainly related to mining activity and traveled extensively by mine personnel, she has done just that. "[T]he theoretical possibility that an agency might someday abuse its authority is of limited relevance in determining whether the agency's interpretation of a congressional delegation is reasonable." *PDK Labs. Inc. v. U.S. Drug Enforcement Admin.*, 438 F.3d 1184, 1192 (D.C. Cir. 2006). Should MSHA use its jurisdiction over the access road to unduly burden National Cement or Tejon, "the courts remain open to consider a challenge to that action," *id.*

Our final concern was that Tejon and other right-of-way grantees who may operate, control, or supervise the road would be deemed mine "operators" even though they have no connection to mining. *See Nat'l Cement*, 494 F.3d at 1076. The Secretary responds that an entity like Tejon should be required to shoulder certain responsibilities to the extent it maintains enough control over a mining road to be a mine "operator." It is reasonable, for example, that such an entity be required to perform necessary road maintenance and comply with withdrawal orders. *See* Br. of Sec'y at 47.[5] In the Secretary's view, these are "modest burden[s] compared to the importance of the health and safety concerns involved," Reply Br. of Sec'y at 28 (quoting *D.H. Blattner & Sons v. Sec'y of Labor*, 152 F.3d 1102, 1108 (9th Cir. 1998)). We

---

[5] National Cement and Tejon argue that Tejon's control and authority over the road are insufficient to make Tejon an operator because it has no connection to mining. We need not resolve this issue as the Secretary seeks only to hold National Cement responsible for the conditions of the access road.

agree. It is noteworthy that although Tejon is not a typical mine operator, it does have a significant connection to mining. After all, Tejon directly benefits from National Cement's use of the road. In exchange for the easement that permits National Cement to haul cement and equipment over its land, Tejon receives payments from National Cement based on cement sales. Granting National Cement an easement was a business decision in which Tejon determined that the costs associated with the cement company's use of its land were outweighed by the expected benefits of the transaction. It cannot argue in good faith that it lacks any relation to National Cement's mining operations.

Accordingly, we hold that the Secretary has adequately addressed our concerns. Her interpretation is reasonable in light of the overall enforcement scheme of the Mine Act.

## IV.

For the foregoing reasons, we grant the petition for review, vacate the decision of the Commission, and remand for proceedings on the merits of the citation.

*So ordered.*