# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued December 15, 2022     Decided August 1, 2023

No. 22-1071

SECRETARY OF LABOR, MINE SAFETY AND HEALTH
ADMINISTRATION,
PETITIONER

v.

KC TRANSPORT, INC. AND FEDERAL MINE SAFETY AND
HEALTH REVIEW COMMISSION,
RESPONDENTS

———

On Petition for Review of a Decision of the
Federal Mine Safety and Health Review Commission

———

*Susannah M. Maltz*, Attorney, U.S. Department of Labor, argued the cause for petitioner. With her on the briefs was *Emily Toler Scott*, Counsel for Appellate Litigation.

*James P. McHugh* argued the cause for respondent KC Transport, Inc. With him on the brief was *Christopher D. Pence*. *Thaddeus Jason Riley* entered an appearance.

Before: WILKINS, WALKER, and PAN, *Circuit Judges*.

2

Opinion for the Court filed by *Circuit Judge* WILKINS.

Dissenting opinion filed by *Circuit Judge* WALKER.

WILKINS, *Circuit Judge*:   Congress affirmed the importance of regulating effective health and safety standards within the mining industry when it enacted the 1977 Federal Mine Safety and Health Amendments Act ("Mine Act"), Pub. L. No. 95-164, 91 Stat. 1290 (1977) (codified as amended at 30 U.S.C. § 801 *et seq.*).   This dispute does not concern the substance of the Mine Act's safety standards, but rather the jurisdictional boundaries to which they apply.

KC Transport is an independent trucking company that provides various hauling services.  Some of its clients include mining companies, and KC Transport used a facility, located over one mile from one of its client's mining extraction sites, as a maintenance area.   A Mine Safety and Health Administration ("MSHA") inspector visited this area, after having inspected the nearby mine, and observed two of KC Transport's trucks undergoing maintenance.  Both trucks were raised, unblocked from motion, and one truck had a person standing underneath it.  Because the trucks' conditions violated safety standard 30 C.F.R. § 77.404(c), the MSHA inspector issued KC Transport two citations.  KC Transport contested MSHA's jurisdiction to issue the citations, arguing that the Mine Act does not apply.  If the Mine Act does apply, however, KC Transport concedes that its trucks violated safety standards and the citations are thus valid.

The Mine Act governs the regulation of "coal or other mine[s,]" 30 U.S.C. § 802(h)(1), as well as the activities of those who "operate[], control[], or supervise[,]" or "perform[] services or construction at such mine[s]," called "operator[s,]" *id.* § 802(d).  Its jurisdiction covers all "mines," which are

defined by statute as: (A) extraction sites; (B) the "private ways and roads appurtenant" thereto; and (C) a list of items "used in, or to be used in, or resulting from," mining-related activity. *Id.* § 802(h)(1).

In the proceeding on review challenging MSHA's jurisdiction, the Federal Mine Safety and Health Review Commission ("Commission") held that for the list of items, in § 802(h)(1)(C), to be considered a "mine," the items had to be located at an extraction site, *id.* § 802(h)(1)(A), or the roads appurtenant thereto, *id.* § 802(h)(1)(B). Because neither the trucks nor the facility, associated with the citations at issue, were located on land covered under subsections (A)–(B), the Commission found they failed to constitute a "mine" and vacated the citations. The Commission also found that, as an independent contractor not engaged in servicing a mine at the time of citation, KC Transport failed to qualify as an "operator" under § 802(d) of the Mine Act.

The Secretary of Labor ("the Secretary"), acting through MSHA, appeals the Commission's decision and asks us to uphold the two citations as an appropriate exercise of the Secretary's jurisdiction under the Mine Act. In the Secretary's view, subsection (C) of the "mine" definition covers KC Transport's facility and trucks because they were "used in" mining activity. *See* § 802(h)(1)(C).

Given the Mine Act's language, context, and our binding precedent, we find that the Commission erred in its interpretation of the "mine" and "operator" definitions. And we generally defer to the Secretary's reasonable interpretation of an ambiguous statute—even when the Commission disagrees. *See Martin v. Occupational Safety & Health Rev. Comm'n*, 499 U.S. 144, 158 (1991); *Excel Mining*, 334 F.3d at 6. But here, the Secretary's position treats subsection (C) as

unambiguous and makes no meaningful effort to address the numerous practical concerns that would arise under such an interpretation. Therefore, and in conformity with our precedent, we vacate and remand the Commission's decision, allowing the Secretary to interpret the statute's ambiguous language. *See Sec'y of Lab. v. Nat'l Cement Co. of Cal., Inc.* ("*National Cement I*"), 494 F.3d 1066, 1077 (D.C. Cir. 2007).

## I.

### A.

Congress enacted the Federal Coal Mine Health and Safety Act ("Coal Act") in 1969 with the purpose of "improv[ing] mandatory health or safety standards to protect the health and safety of the Nation's coal miners[.]" Pub. L. No. 91-173, § 2(g), 83 Stat. 742, 743 (1969). As our nation's use of mines continued, so too did the occurrence of mining-related incidents. For example, 226 miners tragically died from unexpected mine explosions in West Virginia, Ohio, and Pennsylvania in 1940 alone. *See* J. Davitt McAteer, *The Federal Mine Safety and Health Act of 1977: Preserving a Law that Works*, 98 W. Va. L. Rev. 1105, 1113 (1996). Additional incidents also took the lives of 119 miners in Illinois in 1951; 78 miners in West Virginia in 1968; 91 miners in Idaho in 1972; and 26 miners in Kentucky in 1976. *Id.*

Because several forms of mine-related property were not enumerated in the Coal Act's mine definition, incidents like the collapse of a retention dam left confusion as to whether the Coal Act's protections applied. This lack of clarity put the Act's jurisdictional bounds in question, prompting congressional action. Indeed, upon enacting the more comprehensive 1977 Mine Act, Congress cited the 1972 collapse of the West Virginia retention dam—"result[ing] in a

large number of deaths, and untold hardship to downstream residents[]"—as a reason to amend the "mine" definition. S. REP. NO. 95–181, at 14 (1977) (explaining the need to clarify the "mine" definition as "the Committee [was] greatly concerned that at [the time of the 1972 dam incident], the scope of the authority of the Bureau of Mines to regulate such structures . . . was questioned [under the Coal Act]").

The Mine Act established one regulatory scheme, covering the mining of coal, metals, and non-metals. *See Sec'y of Lab. v. Excel Mining, LLC*, 334 F.3d 1, 3 (D.C. Cir. 2003) (citing 30 U.S.C. § 961(a)). In doing so, Congress affirmed that "the first priority and concern of all in the coal or other mining industry must be the health and safety of its most precious resource— the miner[.]" 30 U.S.C. § 801(a). It also aimed "to provide more effective means and measures for improving the working conditions" in American mines and "to prevent death[,] serious physical harm, and . . . occupational diseases[.]" *Id.* § 801(c). The Secretary is authorized to enforce this goal, and the Mine Act "created within the Department of Labor a new agency, [MSHA], to administer its provisions." *Am. Coal Co. v. FMSHRC*, 796 F.3d 18, 21 (D.C. Cir. 2015). Under this structure, the Secretary "develop[s] and "promulgate[s]" "improved mandatory health or safety standards for the protection of life" in mines. 30 U.S.C. § 811(a). MSHA enforces these standards by conducting regular inspections, *see* § 813(a); issuing safety orders, *see* § 813(k); and issuing citations for violations, *see* §§ 813(a), 815(a); for the Secretary to then assess and assign a corresponding penalty, *see* § 820(a). Any resulting citations, orders, or penalties may be reviewed by the Commission. In practice, mine operators may contest citations before an administrative law judge ("ALJ"), and either party may subsequently appeal the ALJ's decision to the Commission. *Am. Coal Co.*, 796 F.3d at 21.

Given the nature of this case, it is important to emphasize that no part of this miner-safety-centered process applies absent jurisdiction. Whether property is subject to the Mine Act's frequent inspections and other procedures is thus contingent upon whether the property constitutes a "mine." A "coal or other mine" is defined under 30 U.S.C. § 802(h)(1) as:

> (A) an area of land from which minerals are extracted in nonliquid form or, if in liquid form, are extracted with workers underground, (B) private ways and roads appurtenant to such area, and *(C)* lands, excavations, underground passageways, shafts, slopes, tunnels and workings, structures, *facilities, equipment, machines, tools, or other property* including impoundments, retention dams, and tailings ponds, on the surface or underground, *used in, or to be used in, or resulting from, the work of extracting such minerals* from their natural deposits in nonliquid form, or if in liquid form, with workers underground, *or used in, or to be used in, the milling of such minerals*, or the work of preparing coal or other minerals, and includes custom coal preparation facilities.

30 U.S.C. § 802(h) (emphases added). In sum, the statute's jurisdiction over "mines" covers: (1) extraction sites; (2) the "private ways and roads appurtenant" thereto; and (3) a list of items "used in, or to be used in," mining-related activity. *Id.*

## B.

The material facts are undisputed. *See* J.A. 4–13 (Joint Stipulations). KC Transport is an independent trucking company that operates truck maintenance and storage, and also

provides hauling services to various businesses for different materials (*e.g.*, coal, earth, and gravel). The following events took place at one of KC Transport's locations—the Emmett facility located in Emmett, West Virginia.

One of KC Transport's clients is a coal mine operator named Ramaco Resources ("Ramaco") that maintains five mines near the Emmett facility ("facility"). Ramaco's representatives informed KC Transport that it could use the facility for maintenance, as Ramaco had no plans to operate a coal mine there. KC Transport accepted and began using the facility as its "maintenance area/shop." J.A. 7. KC Transport also obtained commercial insurance covering the facility.

At the time in question, the facility included only a parking area and two maintenance shipping containers. The facility was described as a "convenient centralized maintenance facility . . . for KC Transport," J.A. 7, and KC Transport used it to operate about 35 trucks. Ramaco's deep mines are about four to five miles away, and its strip mines are about six miles away. An estimated "60% of the [facility's] services" supported Ramaco's five nearby mines, and the remaining 40% of services aided other companies like "American Electric Power [] and other coal operators." J.A. 7. The types of trucks at the facility are a mix of (1) off-road trucks, providing haulage for Ramaco's five nearby mines; and (2) on-road trucks used in earth and gravel haulage for other customers, as well as coal haulage services for non-Ramaco customers.

The facility is on Right Hand Fork Road located over one mile from one of Ramaco's coal plants, the Elk Creek Preparation Plant. Right Hand Fork Road is a road off of the haulage road that runs past Elk Creek Plant and dead ends on the other side of the facility. The facility is about 1000 feet from the haulage road, and while the road leading "into the KC

Transport facility is not a coal haulage road[,] [it] does branch off from a haulage road." J.A. 6. The only way to access the facility is by advancing through a gate entrance on Right Hand Fork Road, and while part of the haul-road is public, everything past the gate is reserved for authorized persons. During this time, however, the gate was not operational.

On March 11, 2019, an MSHA coal mine inspector visited Ramaco's nearby Elk Creek Prep Plant. Although MSHA had never inspected, or even attempted to inspect, KC Transport's trucks at the facility, MSHA regularly inspected KC Transport's trucks along the haulage road, as well as at the Elk Creek Plant. Upon completing the Elk Creek Plant inspection, the inspector went "looking for trucks" that MSHA had previously cited and intended to terminate those citations. J.A. 5; *see* 30 U.S.C. § 814(e)(3). The inspector traveled over a mile along the haulage road, turned off this road onto Right Hand Fork Road, continued along this road for about 1000 feet, and ultimately reached the facility.

Upon arriving at the facility, the inspector observed KC Transport's trucks undergoing maintenance. According to MSHA safety regulations, "[r]epairs or maintenance shall not be performed on machinery until the power is off and the machinery is blocked against motion, except where machinery motion is necessary to make adjustments." 30 C.F.R. § 77.404(c). Two of KC Transport's trucks, however, were unblocked. Notably, because these particular trucks "were not licensed to haul products over public roads[,]" they were "only being operated on private land," J.A. 10, and "regularly used to haul coal from the five Ramaco mines to the Elk Creek prep plant[,]" J.A. 8. At the time of inspection, the first truck was "jacked up with the wheels and tires off both back axles[,]" and "[w]ork [was] being performed on the brakes located on the back axles of the truck." J.A. 30–31. The second truck was

raised and a miner was underneath it, "standing on the frame of the truck[.]" J.A. 31; *see* J.A. 58. Because neither of the two trucks were "blocked against motion," the inspector found KC Transport in violation of 30 C.F.R. § 77.404(c), and issued Citations Nos. 9222038 and 9222040.

**C.**

The primary issues in this litigation concern jurisdiction: (1) whether the facility or the two trucks constituted a "mine" under 30 U.S.C. § 802(h)(1)(C) of the Mine Act, such that MSHA had the authority to cite KC Transport for violating safety regulation 30 C.F.R. § 77.404(c); and (2) whether an independent contractor like KC Transport only qualifies as an "operator" under 30 U.S.C. § 802(d) when actively working at a mine site. If the Mine Act *does* apply, the parties agree both citations should be upheld and KC Transport owes a penalty fee of $3,908 regarding citation No. 9222038, and $4,343 regarding citation No. 9222040. *See* J.A. 12–13.

Once KC Transport contested the two citations, both the Secretary and KC Transport filed cross-motions, requesting summary decision of the jurisdictional issue. The ALJ rejected the parties' interpretations of subsection (C), but ultimately ruled in MSHA's favor and upheld the two citations as a proper exercise of the Mine Act's jurisdiction. In the ALJ's view, the facility and the mining-related equipment located therein were too connected to the mining process to be excluded from the Mine Act's jurisdiction. Thus, the ALJ found the facility constituted a "mine" under the subsection (C)'s plain meaning, "and because the trucks were used in mining and parked at the facility," they qualified as "equipment" under subsection (C). J.A. 84.

On appeal, a divided Commission reversed the ALJ's finding of jurisdiction and vacated the two contested citations. According to the majority, 30 U.S.C. § 802(h)(1) unambiguously limits the "mine" definition to extraction sites and lands appurtenant thereto. Thus, the Commission held "that an independent repair, maintenance, or parking facility not located on or appurtenant to a mine site and not engaged in any extraction, milling, preparation, or other activities within the scope of subsection 3(h)(1)(A) is not a mine within the meaning of section 3(h) of the Mine Act." J.A. 168. In a secondary holding, the Commission also found that KC Transport did not qualify as an "operator" under the Mine Act, because "[a]s an independent contractor, KC Transport is an operator subject to MSHA jurisdiction [only] while performing work at a mine site." J.A. 165. One commissioner dissented, taking an even broader view than the ALJ, and argued that regardless of the facility, trucks constitute mines as they were "used in" mining and are "integral" to that process. J.A. 176. The Secretary filed a petition for review of the Commission's decision.

## II.

We review the Commission's legal findings *de novo*. *See Am. Coal Co.*, 796 F.3d at 23. "Under the Mine Act, the Secretary's interpretation of the law must 'be given weight by both the Commission and the courts.'" *Excel Mining*, 334 F.3d at 5–6 (quoting *Sec'y of Lab. v. Cannelton Indus., Inc.*, 867 F.2d 1432, 1435 (D.C. Cir. 1989) (quoting S. REP. NO. 95–181, at 49)). Should the Secretary and the Commission advance differing interpretations, "it is . . . the Secretary rather than the Commission who is entitled to the deference described in *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984)." *Excel Mining*, 334 F.3d at 6 (cleaned up); *see also Am. Coal*, 796 F.3d at 23–24. But if the

Secretary incorrectly treats the statute as unambiguous, such that deference is not appropriate, we have previously remanded the case to the Commission, instructing the Secretary to interpret the statute in recognition of its ambiguities. *See Sec'y of Lab. v. Nat'l Cement Co. of Cal., Inc. ("National Cement II")*, 573 F.3d 788, 791 (D.C. Cir. 2009).

**A.**

"Under these circumstances, the Secretary's litigating position before the Commission is as much an exercise of delegated lawmaking powers as is the Secretary's promulgation of a workplace health and safety standard." *Martin*, 499 U.S. at 157. Accordingly, we turn to the Secretary's argument, maintaining that the trucks at issue fell under the Mine Act's jurisdiction under a plain reading of subsection (C). The Secretary maintains this Court should uphold the contested citations because 30 U.S.C. § 802(h)(1)(C) unambiguously grants MSHA jurisdiction over both the trucks and the maintenance facility. Under this interpretation, subsection (C) unambiguously extends the Mine Act's jurisdiction to cover each of the enumerated types of items if "used in, or to be used in" mining. Because the trucks are "equipment," and because both the trucks and the facility were "used in" mining activity, the Secretary argues they satisfy the "mine" definition.

Although advancing an opposing interpretation, the Secretary, like KC Transport in defending the Commission's decision, asserts that the Act's "mine" definition is unambiguous. As such, the Secretary urges us to uphold the citations as a proper exercise of MSHA's jurisdiction under a plain reading of the statute.

This was the case in *National Cement I*, 494 F.3d at 1066. The central issue there was whether "a road National Cement use[d] to access its cement processing plant [] pursuant to a nonexclusive right-of-way grant" constituted a "mine" under 30 U.S.C. § 802(h)(1). *Id.* at 1068. The Secretary defended its jurisdiction over the private road, arguing that because the road led to a cement processing plant, it unambiguously constituted a "private way[] and road[] appurtenant to" an extraction area under a plain reading of subsection (B), 30 U.S.C. § 802(h)(1)(B). Finding subsection (B) ambiguous, we declined to "accord the Secretary's litigating position *Chevron* deference because she incorrectly treated the statute as unambiguous and interpreted it accordingly." *Nat'l Cement I*, 494 F.3d at 1073 (citing *Peter Pan Bus Lines, Inc. v. Fed. Motor Carrier Safety Admin.*, 471 F.3d 1350, 1354 (D.C. Cir. 2006) ("[D]eference to an agency's interpretation of a statute is not appropriate when the agency wrongly believes that interpretation is compelled by Congress." (internal quotation marks omitted))).

As we explained, the statute's use of the term "private" could encompass either a "group or class of persons," or "a particular person[,]"—and similarly, "appurtenant" could mean a road either "subject to a transferable right of way benefitting the mine lessee," or "dedicated exclusively to the use of the mine." *Nat'l Cement I*, 494 F.3d at 1074. Thus, we vacated and remanded the Commission's decision for the Secretary to interpret the ambiguous provision. On remand, the Secretary relied on two subsections and argued that subsection (B) extended over the road itself, while subsection (C) covered the mine-related vehicles traveling on the road. *See* 573 F.3d at 794. Satisfied that this interpretation reasonably accounted for the statute's ambiguities, the *National Cement II* Court found "the Secretary's interpretation of subsection (B)" was "entitled" to deference. *Id.* at 793.

Such an approach was not unique to *National Cement I*, as we took a similar path in *Akzo Nobel Salt, Inc. v. Federal Mine Safety and Health Review Commission*, 212 F.3d 1301, 1304–05 (D.C. Cir. 2000). There, the Secretary asserted that a regulation unambiguously applied to and covered the citation at issue. We disagreed and found the regulation's language ambiguous. The Secretary, however, "never grappled with" the "regulation's clear ambiguity[,]" and because the Secretary had taken inconsistent positions, we vacated and remanded the Commission's decision. *Id.* at 1305 (instructing the Commission to secure the Secretary's regulatory interpretation, "and to resolve the case applying standard deference principles to that interpretation").

To be clear, it is the Secretary's litigating position resulting from a citation—not the Commission's position—that is ordinarily owed deference. *See Excel Mining, LLC*, 334 F.3d at 6 (citing *Martin*, 499 U.S. at 157). We cannot defer, however, when the Secretary's position mistakenly advances an interpretation *compelled* by Congress when the statute is in fact ambiguous. And as our case law shows, we have previously addressed such a mistake by remanding the case for the Secretary to account for the identified ambiguity.

As we discuss below, here again, we are faced with a situation where the Secretary incorrectly asserts that the relevant text—30 U.S.C. § 802(h)(1)(C)—is unambiguous. Thus, we remand the case, allowing the Secretary to address § 802(h)(1)(C)'s ambiguities.

Beginning with the statutory text, recall that § 802(h)(1) defines a "mine" as: (1) the physical extraction site, under subsection (A); (2) any "private ways and roads appurtenant" to that extraction site, under subsection (B); and (3) the items

"used in, or to be used in, or resulting from" mining activity, under subsection (C). Congress's inclusion of subsection (C) clarifies that the Mine Act extends beyond the land and roads covered in subsections (A)–(B). The Secretary argues the "mine" definition must be read so broadly that it incorporates each of subsection (C)'s items as an individual "mine." Put differently, the Secretary advances a view under which all "machines, tools," and even singular pieces of "equipment," could constitute a "mine"—no matter their location—so long as they either were, or will be, "used in" mining activity. But certain "equipment[]"—like a truck—is mobile, and without a clear locational limit, it is impossible to ensure MSHA could monitor the equipment's location and complete the statutorily mandated inspection requirements.

As indicated by its context, structure, and Congress's use of the phrase "coal or other mine" throughout Chapter 22 of Title 30—location is central to the Mine Act. Consider the process through which MSHA ensures compliance with the Mine Act's safety regulations. To start, Congress instructs that "[e]ach operator of a coal or other mine subject to this chapter *shall* file with the Secretary the name and *address* of such mine[.]" 30 U.S.C. § 819(d) (emphases added). In addition to recording the mine's location, Congress also instructed that each "coal or other mine" "shall" be inspected yearly, four times a year for "each underground coal or other mine[,]" and twice a year for "each surface coal or other mine." *Id.* § 813(a).

The statute delineates the limited circumstances under which the Secretary "may give advance notice of inspections[,]" and provides that authorized representatives "*shall* have a right of entry to, upon, or through any coal or other mine." *Id.* (emphasis added). No discretion is accorded once the inspection is underway, and the Mine Act *requires* inspectors to issue a citation upon belief "that an operator of a

coal or other mine" violated "any mandatory health or safety standard, rule, order, regulation, or order[.]" *Id.* § 814(a)).

In addition to requiring a physical address for inspection purposes, the Mine Act also mandates that each "coal or other mine" operator "designate a responsible official" "in charge of health and safety" for each identified mine. *Id.* § 819(d). The Mine Act even outlines certain design requirements for every identified mine. "At each coal or other mine there shall be maintained an office with a conspicuous sign designating it as the office of such mine." *Id.* § 819(a). This office must also include "a bulletin board" near the entrance such that "orders, citations, notices and decisions required by law or regulation . . . may be posted[.]" *Id.* It is, thus, clear that no operator could comply with these provisions without first identifying a physical address for each of its mines.

The Commission's interpretation fares no better than the Secretary's, because treating subsection (C) as inherently connected to subsections (A)–(B) cannot be harmonized with the statutory structure under which there are three separate and independent subsections. *See id.* § 802(h)(1)(A)–(C). If a "mine" is so clearly defined under subsections (A)–(B), what then to make of subsection (C)? Because the Commission finds it "clear that neither the purpose nor the language of the Act indicate a further geographical extension of jurisdiction under subsection (C)[,]" it reasons that subsection (C) *must* be read as "catalog[ing] various mining-related places . . . and objects" that are used in mining activity at physical extraction sites described in subsection (A), or the roads appurtenant thereto, described in subsection (B). J.A. 163–64; *see Maxxim Rebuild Co. v. FMSHRC*, 848 F.3d 737, 740 (6th Cir. 2017) (explaining that subsection (C) reads as though "the author went to a mine and wrote down everything he saw in, around, under, above, and next to the mine" and limiting the definition "only to

everything that one would see in or around a working mine" itself). Not so.

One need only look to Congress's concerns—cited when explaining its decision to revise the Coal Act's "mine" definition—to conclude that subsection (C) was incorporated to specify that non-extraction site property may *also* constitute a "mine" when it (1) is "used in," (2) will "be used in," or (3) "result[s] from" the work of extracting or preparing minerals. 30 U.S.C. § 802(h)(1)(C). As briefly mentioned in relation to the deadly mining-related incidents, subsection (C) was necessary—at least in part—to ensure the Mine Act's jurisdiction extended to physical manifestations like dams that may be distant from the actual extraction site. Limiting jurisdiction to the land in subsections (A)–(B) would effectively omit subsection (C) and could exclude the very property Congress intended to cover.

The Commission's decision cannot stand for another fundamental reason: such a narrow view of 30 U.S.C. § 802(h)(1) conflicts with this Circuit's precedent under which we have clarified that the Mine Act extends beyond structures on extraction sites. In *Donovan v. Carolina Stalite Co.*, we explained that the Mine Act "does not require that those structures or facilities [listed in subsection (C)] . . . be located on property where such extraction occurs." 734 F.2d 1547, 1548, 1552 (D.C. Cir. 1984) (finding that a "slate gravel processing facility" placed on "property immediately adjacent to a quarry" fell under the Mine Act's jurisdiction). Importantly, we also endorsed the view that MSHA's "jurisdictional bases were expanded accordingly [in the 1977 Mine Act] to reach not only the 'areas . . . from which minerals are extracted,' but also the 'structures . . . which are used or are to be used in . . . the preparation of the extracted minerals.'" *Id.* at 1554 (quoting S. REP. NO. 95–181). This conclusion

applies equally to all property listed in subsection (C) which, as relevant here, includes both "structures" and "equipment."

Although the Secretary nominally recognized that the statute could be ambiguous, and advanced an alternative argument seeking our deference, at no point during this litigation did the Secretary grapple with the conflicting, practical implications of the advanced interpretation. *See* Sec'y Br. 38–42; Sec'y Reply Br. 5, 14–17; Sec'y Supp. Br. 11–13. Nor did the Secretary acknowledge the statute's ambiguity as demonstrated by its historical background. For instance, when passing the 1977 Mine Act, Congress explained it would "enlarge[] the definition of 'mine' in [30 U.S.C. § 802(h)] to include those mines previously covered by the [1966] Federal Metal and Non-Metallic, Mine Safety Act ['Metal Act']." S. REP. NO. 95–181, at 59; *see* Pub. L. No. 89-577, 80 Stat. 772 (1966) (repealed 1977). The Metal Act fell under the Department of Interior, and the Mining Enforcement and Safety Administration ("MESA") exercised the agency enforcement role like the one MSHA occupies today. When referring to the Metal Act's jurisdiction, a 1974 MESA-OSHA Memorandum of Understanding ("MOU") explained that a "mine," under this predecessor to the Mine Act, included "mineral extraction (mining) operations" as well as "milling and preparation facilities and other surface facilities used in mining or milling." 39 Fed. Reg. 27,382, 27,383 (July 26, 1974) (summarizing 30 U.S.C. § 721(b)). From this, MESA "interpret[ed] its authority to include the prescription and enforcement of standards regarding" a variety of operations, locations, and "transportation." *Id.* But nowhere in the later 1979 MSHA-OSHA MOU, pertaining to the 1977 Mine Act, is there any mention of MSHA's authority as covering transportation. 44 Fed. Reg. 22,827, 22,827 (Apr. 17, 1979). What this might, or might not, signify—in relation to subsection (C)'s scope today—remains a mystery as the

Secretary's briefs failed to discuss it. This lack of analysis further indicates the need to remand for the Secretary to engage with subsection (C)'s ambiguity.

In the Secretary's view, however, any risk of incorrectly broadening subsection (C) is mitigated by a functional analysis that officials conduct in determining whether certain facilities or equipment constitute a "mine." Framed as a limitation, the Secretary argues that whether facilities or equipment constitute a "mine" depends only on a fact-based inquiry under which one must evaluate how closely related the relevant facility or equipment was to mining activity. Location is but one factor that *may* be relevant to this "use-in-mining" analysis. Oral Arg. Tr. at 10:3; *see id.* at 9–17; Sec'y Supp. Br. 13, 21. But such a fact-based inquiry does nothing to explain how MSHA might locate mobile equipment, such as the trucks at issue here, and fulfill its *mandatory* obligations to "make frequent inspections." 30 U.S.C. § 813(a). Indeed, without an identifiable address, how will inspectors know where to find all equipment that has, or will be, "used in" mining? And how long after equipment is "used in" mining does it still qualify as a "mine" if no longer located on mine-related property? The Secretary's broad and categorical view, although temptingly clear in theory, ultimately creates many more questions in practice. These questions bespeak ambiguity, and the Secretary's litigation position must explain how they were taken into account.

We note that all but *three* of the items enumerated in subsection (C) constitute physical manifestations. The physical manifestations—including, for example, "tunnels and workings, structures, facilities, . . . [and] retention dams[]"— are similar to the extraction sites and roads outlined in subsections (A)–(B) because they are stationary and, thus, associated with a particular location. 30 U.S.C. § 802(h)(1)(C).

The three movable items—"equipment, machines, [and] tools," *id.*—stand alone as property subject to much broader, non-mining related definitions. And as "[a] canon related to *noscitur a sociis, ejusdem generis,* counsels: 'Where general words follow specific words in a statutory enumeration, the general words are usually construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words.'" *Yates v. United States*, 574 U.S. 528, 545 (2015) (cleaned up). One way of interpreting subsection (C) is therefore to view the three movable items included in the middle of the list in relation, and as connected, to the preceding physical manifestations.

As applied here, there is at least a question of whether "equipment, machines, [and] tools," when read within the wider Chapter 22 context, constitute "coal or other mine[s]" only when there is an established connection to the fixed physical manifestations listed before and after them. 30 U.S.C. § 802(h)(1)(C). It is unclear, however, whether such an established connection impacts the circumstances under which the three movable types of property remain "mines" when not physically connected to the manifestations listed in subsections (A)–(C). At a minimum, the statutory language, broader context, and numerous practical concerns render subsection (C)'s meaning ambiguous.

Our dissenting colleague contends that "an item listed in subsection (C) must be located at an extraction site or a processing plant to count as a 'mine' under the Act." Dissenting Op. 8. This restrictive construction of the statute countermands our observation in *Donovan* that the Act included a "sweeping definition of a mine[,]" 734 F.2d at 1554 (internal quotation marks omitted), as well as our ruling in *National Cement II* that the "broad statutory definition of 'mine[]' . . . extends the protections of the Mine Act beyond

the actual site where mining takes place." 573 F.3d at 795. The dissent's interpretation also contradicts our recognition in *National Cement I* that, as a procedural matter, the Secretary should "confront" the breadth and ambiguity of the Act in the first instance. 494 F.3d at 430. In that case, we held that because the definitional terms of "mine" in subsection (B) of the Mine Act "are ambiguous and the Secretary instead interpreted them as having a plain, unambiguous meaning, we vacate the Commission's decision and remand for it to obtain from the Secretary a *Chevron* step 2 interpretation[.]" *Id.*; *see also Akzo Nobel Salt, Inc.*, 212 F.3d at 1304–05 (explaining that while the Secretary asserted that a Mine Act regulation unambiguously applied, we found the regulation's language ambiguous and remanded for the Secretary to "grappl[e] with" the "regulation's clear ambiguity"). We are of course bound by our precedent. *LaShawn A. v. Barry*, 87 F.3d 1389, 1393 (D.C. Cir. 1996). The dissent's oversimplification also elides the interpretive difficulty that arises when a truck is cited while located on an extraction or processing site, but MSHA later goes looking for the truck outside the extraction or processing area to determine whether the cited violations have been abated—which is exactly how the present dispute began. *See supra* at 8; J.A. 5. Does the statute unambiguously provide that MSHA loses jurisdiction over a truck once it leaves the extraction or processing area? Apparently so, under the dissent's view. But that reading of the statute renders enforcement of the Mine Act unworkable, frustrating Congress's intent.

## B.

The Commission's secondary ruling, concerning the Mine Act's "operator" definition, faces a similar fate as its first. An "operator" is defined under § 802(d) as "any owner, lessee, or other person who operates, controls, or supervises a coal or

other mine or any independent contractor *performing services* or construction at such mine[.]" 30 U.S.C. § 802(d) (emphasis added). To further confirm that the Secretary lacked jurisdiction to issue the citations, the Commission held that KC Transport failed to qualify as an "operator" under the Mine Act. It reasoned that "[a]s an independent contractor," KC Transport only qualifies as "an operator subject to MSHA jurisdiction while performing work at a mine site[,]" and "[w]hen the citations were issued" here, "KC Transport was not performing services in a mine." J.A. 165. Because the trucks were parked and off the mine site, "KC Transport was not performing services in a mine[]" when the two citations were issued and, therefore, was not an "operator." *Id.*

The Secretary asks us to vacate the ruling, not only because the Commission incorrectly narrowed the circumstances under which an independent contractor qualifies as an "operator" under the Mine Act, but also because it exceeded its jurisdiction by deciding an unraised issue in the first instance. We find it especially telling that KC Transport chooses not to defend the Commission's "operator" ruling on the merits. Instead, KC Transport insists this is a non-issue, because rather than a secondary holding, the Commission merely quoted statutory language discussing "operators" to further support its "mine" definition ruling. This argument is clearly rebutted by the record, revealing the Commission found KC Transport "was not an operator under section 3(d)" because it "was not performing services in a mine[.]" J.A. 165. We therefore review the Commission's secondary "operator" holding and find it lacked jurisdiction to make such a ruling.

The Commission's jurisdiction is limited to questions that were reviewed by the ALJ, and then included in the petition for discretionary relief on appeal. *See* 30 U.S.C. § 823(d)(2). However, the record shows that the ALJ never considered KC

Transport's "operator" status. As the parties' joint stipulations confirm, KC Transport conceded that its trucks' conditions violated 30 C.F.R. § 77.404(c) "should the [ALJ] find that MSHA did have jurisdiction over the *trucks*[.]" J.A. 12 (emphasis added). KC Transport then repeated this concession in its briefs before the ALJ, and both parties advanced arguments that focused exclusively on the Mine Act's jurisdiction concerning the trucks and, or, the facility. Neither party so much cited 30 U.S.C. § 802(d)'s "operator" definition, and there is no trace of such a discussion in the ALJ's decision. *See* J.A. 75 ("The parties have stipulated that should this Court find that MSHA had jurisdiction over the trucks and location, the cited conditions would constitute violations of 30 C.F.R. § 77.404(c)[.]"). And the parties maintained the same focus on 30 U.S.C. § 802(h)(1)'s "mine" definition before the Commission. Thus, KC Transport's "operator" status was not questioned until the Commission issued its majority decision.

Because the Commission resolved this unraised issue on its own without the benefit of briefing—and in the first instance—it failed to abide by its jurisdictional boundaries under 30 U.S.C. § 823(d)(2). And although there is a process through which the Commission may exercise its discretion to reach additional issues, *see id.* § 823(d)(2)(B), nothing in the record shows it followed that procedure here.

\* \* \*

To be sure, the Mine Act is intentionally broad, and this characteristic helps enable the government to protect and promote miner safety. *Am. Coal Co.*, 796 F.3d at 25. We reiterate, however, that broad authority does not equate limitless jurisdiction. *Nat'l Cement I*, 494 F.3d at 1077. It is the courts' role to ensure this broad authority is exercised within its jurisdictional bounds, and we use a variety of tools

to do so. Ensuring that the Secretary adopts a reasonable interpretation of its jurisdiction by grappling with the questions and challenges posed by an ambiguous statute is one of the devices in our toolkit. But without such an interpretation here, there is nothing to which we may defer. *Id.* at 1075. Heeding the lessons of *National Cement I & II*, we vacate the Commission's decision and remand for the Secretary to reconsider its position pursuant to a revised interpretation of subsection (C), after recognizing its ambiguity and addressing the questions outlined in this opinion. *See id.* at 1077.

*So ordered.*

WALKER, *Circuit Judge*, dissenting:

KC Transport is a small trucking company. It occasionally uses its trucks to haul coal for nearby mines. When those trucks break down, KC repairs them at its truck-repair shop — some four miles away from the nearest mine.

Because KC's shop repairs mining trucks, the Secretary of Labor says the shop is a "mine." In his view, any "facilit[y]" "used in . . . the work of extracting [coal]" is a "mine" under the Mine Act. 30 U.S.C. § 802(h)(1). And that puts KC's truck-repair shop within the Mine Safety and Health Administration's jurisdiction.

I disagree. To count as a "mine," a "facility" like KC's shop must be located at an extraction site or a processing plant. KC's shop is not. So the Administration lacks jurisdiction over it.

I would thus deny the Secretary's petition for review.

## I. Background

### A. Mine Safety and Health Administration's Jurisdiction

The Mine Act tasks the Secretary of Labor with setting health-and-safety standards for mines. 30 U.S.C. § 811. To enforce those standards, the Mine Safety and Health Administration must "make frequent inspections and investigations" of "mines." *Id.* § 813(a); *see* 29 U.S.C. § 557a. If a mine operator fails to meet the agency's safety standards, it may issue a citation. 30 U.S.C. §§ 813, 802(d) (a mine "operator" "operates, controls, or supervises a . . . mine").

Because the Administration may inspect and cite only "mines," its jurisdiction depends on the Mine Act's definition of "coal and other mines":

(A) an area of land from which minerals are extracted in nonliquid form or, if in liquid form, are extracted with workers underground,

(B) private ways and roads appurtenant to such area, and

(C) lands, excavations, underground passageways, shafts, slopes, tunnels and workings, structures, **facilities**, equipment, machines, tools, or other property including impoundments, retention dams, and tailings ponds, on the surface or underground, **used in**, or to be used in, or resulting from, the work of **extracting** such minerals from their natural deposits in nonliquid form, or if in liquid form, with workers underground, or used in, or to be used in, the **milling** of such minerals, **or** the work of **preparing coal or other minerals**, and includes custom coal preparation facilities.

*Id.* § 802(h)(1) (emphases added).

Here, we must decide if a truck-repair shop that occasionally fixes mining trucks is a "mine" within the Administration's jurisdiction.

### B. KC Transport's Citations

KC Transport has a contract to haul coal at Ramaco Resources' mines near Emmett, West Virginia. To help KC with the job, Ramaco lets KC use a patch of land off a private road near the mines to maintain its trucks. KC built a parking lot on the land and installed two shipping containers to use as a maintenance shop.

KC's shop is about a mile away from Ramaco's coal-processing plant and more than four miles away from Ramaco's nearest extraction site.  In addition to its arrangement with Ramaco, KC uses trucks from the shop to serve customers that don't mine coal (or anything else).  For instance, it has a "large earth moving project" for a different company.  JA 7.

In 2019, a mine-safety inspector visited KC's repair shop. He noticed that KC was servicing two dump trucks, but had not taken sufficient precautions to prevent the truck beds from moving during maintenance.  That, the inspector decided, was a violation of the Administration's regulations.  30 C.F.R. § 77.404(c).  So he issued KC two citations, one for each truck.

Rather than pay the citations, KC challenged them before the Mine Safety Commission.  It argued that the Administration lacked jurisdiction to issue the citations.  The agency may issue citations only to "an operator of a coal or other mine," and, KC pointed out, its repair shop is not a "mine."  30 U.S.C. § 814(a).

An administrative law judge rejected KC's challenge, holding that its shop is a "mine" under the Act.  Because repairing mining trucks is "essential to the coal hauling and preparation process," JA 91, the ALJ reasoned that the shop is a "facilit[y]" that is "used in . . . the work of extracting . . . minerals."  30 U.S.C. § 802(h)(1)).

On appeal, the Commission reversed.  It held that the ALJ's reading of the statute divorced select words in the definition of "mine" from their context.  The full definition — quoted above — is filled with geographic language suggesting that a facility must be close to an extraction site to count as a mine.  *Id.* § 802(h)(1). Because KC's shop is "distant from a mine site, owned by an independent company, and used

for parking and repairing its vehicles," it did not count as a "mine." JA 164. So the agency lacked jurisdiction over it.

Unhappy with the Commission's decision, the Secretary petitioned this court for review, challenging the Commission's interpretation of the Mine Act. I would deny the Secretary's petition.[1]

## II.  KC's Shop Is Not A "Mine"

KC's truck-repair shop is not a "mine" under the Mine Act because it is not located at an extraction site or at a processing plant (where minerals like coal are milled or prepared, turning them from ore into usable products).

## A.  The Act's Definition of "Mine" Has Geographic Limits

Though the Mine Act's definition of "mine" has no express geographic limit, the statute's "carefully calibrated scheme" confirms that there is one. *Turkiye Halk Bankasi A.S. v. United States*, 143 S. Ct. 940, 947 (2023) (looking to the statutory scheme to cabin the reach of a seemingly broad statutory provision); Antonin Scalia, *A Matter of Interpretation* 24 (1997) ("the good textualist is not a literalist").

---

[1] "[A] constitutional quandary [is] raised by a federal court resolving a lawsuit," like this one, "between two Executive Branch agencies." *United States Postal Service v. Postal Regulatory Commission*, 963 F.3d 137, 143 (D.C. Cir. 2020) (Rao, J, concurring). "[S]uch disputes do not appear to constitute a case or controversy for purposes of Article III," because "agencies involved in intra-Executive Branch disputes are not adverse to one another (rather, they are both subordinate parts of a single organization headed by one CEO)." *SEC v. FLRA*, 568 F.3d 990, 997 (D.C. Cir. 2009) (Kavanaugh, J., concurring). Our precedents, however, allow such suits to proceed.

Recall that the Act defines "mine" in three subsections. 30 U.S.C. § 802(h)(1). To count as a mine, a facility must meet the criteria in one of those subsections. *Secretary of Labor* v. *National Cement Co. of California, Inc.*, 573 F.3d 788, 795 (D.C. Cir. 2009) (each subsection independently defines "mine").

Two subsections have express geographic limits: Subsection (A) extends only to excavation sites, covering "area[s] of land from which minerals are extracted," and subsection (B) includes "roads appurtenant to such area[s]." 30 U.S.C. § 802(h)(1).

That leaves us with subsection (C). It's a catch-all list of additional things that may count as mines if they are "used in" "extracting," "preparing," or "milling." *Id.* § 802(h)(1)(C). That list breaks down into three categories:

- *Structures found at excavation sites*: "excavations, underground passageways, shafts, slopes, tunnels and workings."

- *Generic items*: "lands, . . . structures, facilities, equipment, machines, tools."

- *Structures found at preparation plants*: "impoundments, retention dams, and tailings ponds."[2]

---

[2] "Tailings" are a waste product generated by coal processing. They are a "residue separated in the preparation of various products (such as grain or ores)." Tailing (def. 1), *Merriam-Webster* (2023). "[I]mpoundments, retention dams, and tailings ponds" are all structures used to store tailings. 30 U.S.C. § 802(h). An "impoundment" is a generic term for a structure used to "retain tailings." *Technical Report: Design and Evaluation of Tailings Dams*, EPA, at 5 (Aug. 1994), https://perma.cc/68LA-UJRF. A "retention dam" is a method of storing tailings in which the "dam[ ] [is] constructed at full height

Because words "are known by their companions," it makes sense to read the generic items in light of the two other categories in the list. *Gutierrez v. Ada*, 528 U.S. 250, 255 (2000). Doing so suggests that lands, structures, facilities, and equipment must either be at an excavation site or at a processing plant to count as "mines" under the Act. *Cf. Donovan v. Carolina Stalite Co*., 734 F.2d 1547, 1548, 1552 (D.C. Cir. 1984) (subsection (C) "does not require" that processing facilities "be located on property where . . . extraction occurs," so a processing facility "immediately adjacent to a quarry" was a "mine").

Reading the Act that way reveals a geographic limit that neatly mirrors the Act's express functional limit. Under the Act's functional limit, no item on the list in subsection (C) counts as a "mine" unless it is "used in, or to be used in, or resulting from, the work of extracting . . . minerals . . . or . . . the milling of such minerals, or . . . preparing coal or other minerals." 30 U.S.C. § 802(h)(1)(C).[3] Because milling is a type of coal preparation, the Act's functional test boils down to asking whether an item on the list is used in extracting or

at the beginning of the disposal" (in other retention designs the height of the embankment is increased as tailings are added). *Id.* at 6. And a tailings "pond" is a body of wastewater held in by a dam or impoundment. *See id.* at 30.

[3] Milling involves grinding coal into smaller chunks so that it is commercially usable. *See* Peter T. Luckie & Leonard G. Austin, *Coal Grinding Technology*, Dept. Energy (1980), https://perma.cc/EW37-MDVA (describing how several types of coal mills operate). Coal preparation involves extracting coal from the raw material extracted at a mine site. *See* 30 U.S.C. § 802(i) (defining the "work of preparing the coal" as covering the gamut of coal processing: "breaking, crushing, sizing, cleaning, washing, drying, mixing, storing, and loading").

processing coal. Similarly, the Act's geographic limit asks whether an item is at an extraction site or a processing plant.

Now consider the Secretary's literal reading of the statute. The Secretary contends that the Administration's jurisdiction depends only on *function*, not *location*. Pet. Br. 16. In the Secretary's view, any "piece of equipment" or "facility" can be a mine, no matter where it is located. *Id.*

The rest of the statute shows why that reading doesn't work. Many of the Act's provisions assume that a "mine" has a readily identifiable location. Thus, mine "operator[s]" must "file with the Secretary" their mine's "name and address." 30 U.S.C. § 819(d). And at "each . . . mine" there must be "an office with a conspicuous sign designating it as the office of such mine." *Id.* § 819(a). Similarly, the Mine Safety and Health Administration must annually inspect each "coal or other mine." *Id.* § 813(a).

Those requirements would make no sense if a mine's location was unfixed.

Take an example. An independent contractor uses his truck for a mining job each Wednesday. The rest of the week he drives his truck 200 miles away for use on a construction site. Even when it's 200 miles away, that truck is a "mine" on a literal reading of the statute: It is a "machine[ ]" that is "used in, or to be used in, . . . the work of extracting . . . minerals." *Id.* § 802(h)(1). Yet that result clashes with the Act's commands to install "an office with a conspicuous sign" and to file a mine's "name and address." *Id.* § 819(a), (d); *see also Maxxim Rebuild Co., LLC v. Federal Mine Safety & Health Review Commission*, 848 F.3d 737, 742 (6th Cir. 2017) (noting that "other definitions in the Mine Act portray a mine as a place").

The literal reading's problems only deepen from there. The Act covers "independent contractor[s]" when they are "performing services or construction at [a] mine." 30 U.S.C. § 802(d). But if the Act has no geographic limit, the agency could inspect contractors anywhere they go — including at their homes. That's because a contractor's tools and machinery are "used in, or to be used in" extraction wherever they are. *Id.* § 802(h)(1)(C).

Such absurd results are not required by the Act's text. Reading the definition of "mine" in context shows that an item listed in subsection (C) must be located at an extraction site or a processing plant to count as a "mine" under the Act.

## B. Processing Plants Fall Within the Geographic Limits

The Commission and the Sixth Circuit both held, as I would, that the Act has a geographic limit. But they interpreted that limit to cover only extraction sites. I part company with them there. Textual clues suggest that the Act covers *both* extraction sites (where ore is dug out of the ground) *and* processing plants (where ore is made into a usable product).

In *Maxxim Rebuild*, the Sixth Circuit held that "facilities and equipment" count as "mines" under the Act only "if they are in or adjacent to — in essence part of" an *extraction site*. 848 F.3d at 740. The court reasoned that the list in subsection(C) reads as if the "author went to a mine and wrote down everything he saw in, around, under, above, and next to the mine." *Id.* The Commission adopted the Sixth Circuit's interpretation in its decision in this case.

But subsection (C)'s list reads more like the "author went to a mine [and a processing plant] and wrote down everything

he saw." *Id*. That's because three items on the list — "impoundments, retention dams, and tailings ponds" — are associated with coal *processing*, not coal *extraction*. 30 U.S.C. § 802(h)(1)(C); *see supra* note 2.

The rest of § 802(h)(1)(C) confirms that processing plants are included in the Act's geographic sweep. Any item in the list counts as a "mine" if it is "used in, or to be used in . . . the work of *preparing coal*." 30 U.S.C. § 802(h)(1)(C) (emphasis added). And the list ends by expressly stating that a "mine" "includes custom coal preparation facilities." *Id.*

Plus, because many preparation plants *are not* located at extraction sites, the Sixth Circuit's reading would produce an odd regulatory checkerboard. Some processing plants would be covered and others not, depending on how close they are to an extraction site. *See Standards of Performance for Coal Preparation and Processing Plants*, 74 Fed. Reg. 51,950, 51,961 (Oct. 8, 2009) (noting that coal-preparation plants may be at "mine sites" or other "industrial sites"). That outcome is hard to square with Congress's express view that "coal preparation facilities" are covered by the Act. 30 U.S.C. § 802(h)(1)(C).

Finally, interpreting § 802(h)(1)(C) to cover processing plants avoids surplusage. If subsection (C) were limited to items *at* an extraction site, it would largely collapse into subsection (A), which covers "area[s] of land from which minerals are extracted." *Id.* But reading subsection (C) to include processing plants gives it a distinct role in the statutory scheme.[4]

---

[4] My interpretation is consistent with precedent. *Cf.* Maj. Op. 19-20. To repeat, I understand the items listed in § 801(h)(1)(C) to count as "mines" if they are located *either* at an extraction site (where mining

### III. Remand to the Commission is Unwarranted

Though I read the Mine Act's definition of "mine" more narrowly than the Commission, I agree with its bottom-line conclusion. KC's truck repair shop is not a "mine" under the Act because it is not at an extraction site or processing plant. So I would deny the Secretary's petition for review. *See Calcutt v. FDIC*, 143 S. Ct. 1317, 1321 (2023) (we may affirm an agency, despite disagreeing with its reasoning, if the agency "was *required* to take [the] action" at issue (cleaned up)).

Today's majority takes a different tack. It first decides that the statute is ambiguous. Then, it remands to the agency to let the Secretary have a crack at interpreting it. Presumably, once the case comes back up on review, this court will defer under *Chevron* to the Secretary's interpretation of the now-ambiguous statute — at least if it's reasonable. *See Chevron v. Natural Resources Defense Council*, 467 U.S. 837 (1984); *Secretary of Labor v. National Cement*, 494 F.3d 1066, 1068 (D.C. Cir. 2007) (remanding to let the Secretary interpret an ambiguous statute).

---

occurs) *or* at a processing plant (where ore is turned into a usable product). So like *National Cement II*, I would not limit the Act's reach to "the actual site where mining occurs." *Secretary of Labor v. National Cement Co. of California, Inc.*, 573 F.3d 788, 791 (D.C. Cir. 2009). And like *Donovan*, I would consider a processing plant "adjacent to a quarry" to be a "mine." *Donovan v. Carolina Stalite Co.*, 734 F.2d 1547, 1552 (D.C. Cir. 1984). As for whether *National Cement I*, 494 F.3d 1066, 1076 (D.C. Cir. 2007), means that "the Secretary should 'confront' the breadth and ambiguity of the Act" before a court may interpret it, Maj. Op. 20, "go take a look at the decision," *Andy Warhol Foundation for the Visual Arts, Inc. v. Goldsmith*, 143 S. Ct. 1258, 1293 n.2 (2023) (Kagan, J., dissenting) ("I'll take my chances on readers' good judgment").

But that approach too readily relinquishes this Court's duty to "decide all relevant questions of law" and to "interpret . . . statutory provisions." 5 U.S.C. § 706. Deference under *Chevron* is appropriate only in those rare cases when "employing traditional tools of statutory construction" leaves a court "unable to discern Congress's meaning." *SAS Institute Inc. v. Iancu*, 138 S. Ct. 1348, 1358 (2018) (quoting *Chevron*, 467 U.S. at 843 n.9). And even then, a court must satisfy itself that Congress meant to leave a "gap for the agency to fill" using its expertise. *Chevron*, 467 U.S. at 843.

That is not this case. As the parties agree, the meaning of the Mine Act depends on principles of statutory interpretation — not an exercise of policymaking discretion by the Secretary. Thus, the Commission interpreted the Act using "the traditional tools of statutory construction." JA 161. And the Secretary's opening brief acknowledged that "[t]he text is all that is necessary to divine the meaning of what constitutes a mine." Pet. Br. 17. At argument, the Secretary reiterated: "[T]he statute is unambiguous. The Secretary is not asking this Court for deference. The Secretary is simply asking that this Court read the plain meaning of the statute, you know, as the Secretary does." Oral Arg. Tr. 39.

In those circumstances, deference is inappropriate. When the "executive branch . . . ask[s] the court to do what courts usually do in statutory interpretation disputes [and] supply its best independent judgment about what the law means," courts should not "place[] an uninvited thumb on the scale in favor of the government." *Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 140 S. Ct. 789, 790 (2020) (Gorsuch, J., concurring in denial of certiorari); *see also HollyFrontier Cheyenne Refining, LLC v. Renewable Fuels Association*, 141

S. Ct. 2172, 2180 (2021) (refusing to defer when "the government [did] not invok[e] *Chevron*").

Indeed, the Secretary's shifting and self-serving interpretations of the Mine Act show just how inappropriate remand is here. When KC Transport first contested its citations before the ALJ, the Secretary insisted that he had jurisdiction because "each *truck* independently constituted a 'mine'" under the Act. JA 156. After the ALJ rejected that argument — in his view, calling trucks "rolling mines" was "absurd" — the Secretary tweaked his position, now contending that KC's truck-repair *facility* is a "mine." *Id.*; Pet. Br. 17. Today's remand gives the Secretary a *third* bite at the apple.

What's the upshot? A small trucking business is forced once more to fight a moving target. "While it is true enough . . . that one who deals with the Government may need to turn square corners he need not turn them twice" — let alone three times. *United States v. Winstar Corp.*, 518 U.S. 839, 922 (1996) (Scalia, J., concurring) (cleaned up).

Because I agree with the parties that this case can be resolved using the traditional tools of statutory interpretation, I would do just that.

\* \* \*

To count as a "mine" under the Mine Act, a "facility" like KC's shop must be located at an extraction site or a processing plant. KC's shop is not. So the Administration lacks jurisdiction over it.

Because the majority disagrees, I respectfully dissent.